## TRANSPORTATION COMPANY *v.* PARKERSBURG.

1. The city of Parkersburg built within its limits a wharf on the bank of the Ohio River, and prescribed by ordinance certain rates of wharfage on vessels "that may discharge or receive freight, or land on or anchor at or in front of any public landing or wharf belonging to the city, for the purpose of discharging or receiving freight." A transportation company, owning duly enrolled and licensed steamers, which ply between Pittsburgh and Cincinnati and touch at the intermediate points, complained that the wharfage was extortionate, and was merely a pretext for levying a duty of tonnage. The company thereupon filed a bill in the Circuit Court, praying that the prosecution of a suit brought by the city in the State court to collect the wharfage be enjoined, and that the ordinance be declared void, and that other relief be granted. *Held,* that the character of the charges must be determined by the ordinance itself; and as it on its face imposed them for the use of the wharf only, and not for entering the port or lying at anchor in the river, the court, though it might deem them unreasonable and exorbitant, will not entertain an averment that they were intended as a duty of tonnage, nor inquire into the secret purpose of the body imposing them.

2. Wharfage is the compensation which the owner of a wharf demands for the use thereof; a duty of tonnage is a charge for the privilege of entering, or loading at or lying in, a port or harbor, and can be laid only by the United States.

3. The question as to which of these classes, if either, a charge against a vessel or its owner belongs, is one, not of intent, but of fact and law : of fact, whether the charge is imposed for the use of a wharf, or for the privilege of entering a port; of law, whether, upon the facts which are shown to exist, it is wharfage or a duty of tonnage.

4. Although wharves are related to commerce and navigation as aids and conveniences, yet being local in their nature, and requiring special regulations at particular places, the jurisdiction and control thereof, in the absence of congressional legislation on the subject, properly belong to the States in which they are situated.

5. A suit for relief against exorbitant wharfage cannot, as one arising under the Constitution or the laws of the United States, be maintained in the Circuit Court, even though it be alleged that the wharfage was intended as a duty of tonnage; the alleged intent not being traversable.

APPEAL from the Circuit Court of the United States for the District of West Virginia.

The case is stated in the opinion of the court.

*Mr. Milton I. Southard* and *Mr. C. W. Moulton* for the appellant.

*Mr. W. A. Cook* and *Mr. C. C. Cole* for the appellees.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This is an appeal from a decree dismissing a bill in chancery on demurrer.   The complainant below, who is appellant here, according to the statements of the bill, is a corporation of West Virginia, organized for the purpose of carrying on a transportation business on the Ohio River, together with a general wharf and commission business; its principal office being located at the city of Parkersburg.   It is the owner of several steamboats duly enrolled and licensed under the acts of Congress, and plying between Pittsburgh, Wheeling, Parkersburg, Cincinnati, and Covington.   The bill was filed against the city of Parkersburg and its recorder and wharfmaster, to restrain the collection of certain demands for wharfage, and to recover back money previously paid on that account.   It is contended that the city ordinance, under which the wharfage was demanded, is in conflict with the Constitution of the United States; and this is the ground on which the jurisdiction of the Circuit Court of the United States was invoked.   The bill alleges that many years ago the city of Parkersburg caused to be constructed on the banks of the Ohio River at that place a wharf or public landing, to be used by the various steamboats trading on the river and landing at said city; and that said wharf is still controlled by the city under a certain ordinance passed by the mayor and common council in March, 1865, a copy of

which was filed with the bill.   By this ordinance it is ordained that every steamboat, keel-boat, barge, flat-boat, and flat (except ferry-boats) that may discharge or receive freight, or land on or anchor at or in front of any public landing or wharf belonging to the city, or at which the city may lawfully charge and receive wharfage, for the purpose of discharging or receiving freight, shall pay the city for wharfage the following sums or rates for each respectively, to wit: On steamboats of less than 100 tons burden, three dollars for the first twenty-four hours or any part thereof, and one dollar and fifty cents for every subsequent twenty-four hours or any part thereof. On steamboats of 100 and less than 150 tons, three dollars and seventy-five cents for the first, and two dollars for every subsequent twenty-four hours or any part thereof; and so on, regulating the charges according to the tonnage, and reducing them where only a small quantity of freight is discharged or received.   Provision is then made for recovering the wharfage by bringing the parties before the recorder or a justice of the peace.

The bill alleges that under and by virtue of this ordinance the city of Parkersburg has, ever since the organization of the complainant, required it and its agents to pay the charges provided in the ordinance for all the steamboats owned or controlled by it, which have discharged or received freight or passengers, or landed at the said wharf, and that the payments have been made under protest.

The bill then makes the following charge : —

"Your orator further alleges that, as it is advised and believes, the said ordinance is wholly null and void, and is in conflict with those provisions of the Constitution of the United States relating to the regulations of inter-state commerce and prohibiting any State, without the consent of Congress, from laying any duty of tonnage; and that the operation of the same tends to and does abridge the free use of the Ohio River by your orator, to which it is legally entitled by virtue of the enrolment and license of its steamboats under the laws of the United States as aforesaid.   As by reference to said ordinance will appear, the rates of charges made by said city of Parkersburg upon steamboats landing at or in front of the wharf of said city

are based upon and regulated solely by the 'tons burden' of said boats, and said charges are made indiscriminately, whether the boat lands or anchors at or in front of any public landing or wharf of said city. And your orator further avers that the Congress of the United States has never given its consent to the passage or enforcement of said ordinance, but, on the contrary, tonnage duties are expressly prohibited by sect. 4220 of the Revised Statutes of the United States to be levied upon enrolled or licensed vessels trading from one port in the United States to another port within the same."

The bill further alleges that the rates charged by the ordinance are unreasonable, extortionate, and oppressive, and are made and levied as a tax upon commerce for the express purpose (under the assumed pretence of wharfage dues) of replenishing its treasury and increasing its revenue; that the cost of the wharf has been collected over and over again; that it is allowed to remain in bad repair; and that the wharfage dues collected have been used for other city purposes, paying its debts, &c.; that in the year 1876 over $2,700 was collected from various boats and vessels, less than $50 of which was spent on the wharf; and the same thing in other years. These facts are stated for the purpose of showing the extortionate character of the ordinance, and that it is used for the purpose of laying duties and imposts on imports and exports.

The bill further shows that for the recent refusal of the complainant to pay these wharfage charges the city of Parkersburg has instituted suits against it before the recorder under said ordinance; wherefore it prays a decree to restrain all further proceedings against the complainant by said suits or otherwise, from enforcing any judgment recovered by the city for the violation of said ordinance, or otherwise interfering with the rights of the complainant to the free use of the Ohio River by means of its steamboats; and for the recovery of moneys already exacted from it under said ordinance, amounting to over $2,000; and that the ordinance may be declared null and void.

To this bill the defendants demurred, and upon argument of the demurrer the bill was dismissed. From that decree the present appeal is taken.

If sect. 720 of the Revised Statutes, which declares that "the writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a State," applies to suits originally brought in the Circuit Courts by vir- tue of the act of March 3, 1875, c. 137, in cases arising " under . the Constitution or laws of the United States," it is clear that so much of the bill in this case as prays for an injunction to restrain legal proceedings already instituted before the recorder of Parkersburg before it was filed, cannot be maintained.   But that portion of the bill which seeks to have the wharfage ordi- nance declared void, and to restrain any further collections under it, and any further interference with the right of the complainant to the free navigation of the Ohio River, is not open to this objection ; and perhaps the demand for- a return of the wharfage already paid (although itself of a legal nature), may come in as incidental to the other relief. The main question to be solved is, whether, as contended by the complainant, the ordinance is void as being in violation of the Constitution or any law of the United States.

It is conceded by the bill that the wharf for the use of which the charges are made, though public in the sense of being open to the use of the public, belongs to the city of Parkersburg ; that it was built and is maintained by the city as its property ; and the ordinance on its face shows that the charges imposed for landing at or using it are imposed as and for wharfage, and nothing else.   It may be extortionate in amount; but it is wharfage.   The allegations of the bill that it is not real wharfage, but a duty of tonnage, in the name and under the pretext of wharfage, cannot be received against the terms of the ordinance itself.   This would open the door to an inquiry, in every case of wharfage alleged to be unreasonable, which would lead to great inconvenience and confusion.   Neither courts nor juries would have any practicable criterion by which to judge of the secret intent with which the charge was made, whether as wharfage or as a duty of tonnage.   Such an inquiry, if allowed, would bring into question not only the intent of municipal, but of legislative bodies.   When the question is one of reasonable or unreasonable wharfage, we know what to do with it.   It is a question known to the laws ; and the modes of

redress for unreasonable wharfage are fixed and settled. But whether a charge imposed is a charge of wharfage, or a duty of tonnage, must be determined by the terms of the ordinance or regulation which imposes it. They are not the same thing: a duty of tonnage is a charge for the privilege of entering, or trading or lying in, a port or harbor; wharfage is a charge for the use of a wharf. Exorbitant wharfage may have a similar effect as a burden on commerce as a duty of tonnage has; but it is exorbitant wharfage, and not a duty of tonnage; and the remedy for the one is different from the remedy for the other. The question whether it is the one or the other is not one of intent, but one of fact and law: of fact, as whether the charge is made for the use of a wharf, or for entering the port; of law, as whether, according as the fact is shown to exist, it is wharfage or a duty of tonnage. The intent is not material, and is not traversable. It is not like the case of a deed absolute on its face, but intended as a mortgage; there, the intent is the result of an agreement between the parties, which may be proved, and which it would operate as a fraud on one of the parties not to allow to be proved. Nor is it like the case of a mistake in an instrument, by which the intent of the parties is contravened: in that case, also, the actual agreement between them may be shown for the purpose of correcting the instrument. Nor is it like the case of an intent to deceive or defraud or to commit a crime: there, the intent is a material part of the offence charged; whilst in the present case a supposed intent is suggested for the purpose of making of one act, another and a different act. It is, in truth, more like the case of an averment to contradict the express terms of a written instrument by parol.

It is contended, indeed, that the terms of the ordinance in question show that it was intended to exact a duty of tonnage, and is not confined to the prescription of charges for wharfage; and the words "anchor at *or in front of* any public landing or wharf," as describing vessels to be charged, are relied on as sustaining this view, since, as contended, they embrace vessels not using the wharf. But we do not understand this to be the meaning and effect of the words. The whole phrase should be taken together, and thus read, it is evidently confined to vessels

using or intending to use the wharf. The passage consists of two distinct clauses: 1. "Every steamboat that may discharge or receive freight at any public landing or wharf;" 2. "or that may land on or anchor at or in front of any public landing or wharf for the purpose of discharging or receiving freight." The last clause as well as the first evidently points to those vessels only which land or anchor at or before a wharf for the purpose of using it. Sometimes it may happen that the depth of water in the river, or intervening vessels lying at the wharf, will not allow a vessel to get close alongside of the wharf, and yet she may desire to connect with it in some manner, by planks or by the deck of an intervening boat, barge, or float, so as to discharge or receive freight and passengers upon or from the wharf. Such cases are properly described by the language used; and we have no evidence that any other construction has been given to it. The complainant does not allege that the supposed obnoxious application of the ordinance has ever been made against any of its vessels, or against any vessels. The charge of the bill is only "that under and by virtue of said ordinance, the city of Parkersburg has, ever since the time of organization of your orator, required your orator, its agents and servants, to pay to it the charges provided in said ordinance for all steamboats owned or controlled by your orator that have discharged or received freight or passengers, or landed at its said wharf." There is no complaint that wharfage has been exacted when the complainant's vessels have merely anchored in the stream, or have moored at any other place than the city's wharf; or when they have stopped at or in front of the wharf itself for any other purpose than that of discharging or receiving freight and passengers. This makes the case a very different one from that which was presented in *Cannon* v. *New Orleans*, 20 Wall. 577. There the ordinance objected to imposed levee duties "on all steamboats which shall moor or land in any part of the port of New Orleans;" and this court could do no otherwise than hold that such an ordinance had the effect of laying a duty of tonnage, against the express prohibition of the Constitution. The same view had previously been taken of an act of the legislature of Louisiana, authorizing the port wardens of New Orleans to demand and receive five dollars from

every vessel arriving in that port, whether called on to perform any service or not, *Steamship Company* v. *Port Wardens,* 6 Wall. 31; and of a law of Texas, which required every vessel arriving at the quarantine station of any town on the coast of Texas to pay five dollars for the first hundred tons, and one and a half cents for each additional ton. *Peete* v. *Morgan,* 19 id. 581. So, when a law of New York required all vessels of a certain class which should enter the port of New York, or load or unload, or make fast to any wharf therein, to pay a certain rate per ton, this was held to be an unconstitutional imposition, because it applied to all vessels, whether they used a wharf or not. *Inman Steamship Co.* v. *Tinker,* 94 U. S. 238. All these were clear cases of duty on tonnage as distinguished from wharfage; and the terms of the ordinances and laws in question were very different from those of the ordinance now under consideration. We think it very clear that the ordinance in question cannot be regarded as imposing any other charge than that of wharfage. The fact that the rates charged are graduated by the size or tonnage of the vessel is of no consequence in this connection. This does not make it a duty of tonnage in the sense of the Constitution and the acts of Congress. So we have expressly decided in several recent cases. *Cannon* v. *New Orleans,* 20 Wall. 577; *Packet Company* v. *Keokuk,* 95 U. S. 80; *Packet Company* v. *St. Louis,* 100 id. 423; *Guy* v. *Baltimore,* id. 434; *Packet Company* v. *Catlettsburg,* 105 id. 559. When the Constitution declares that " No State shall, without the consent of Congress, lay any duty of tonnage ; " and when Congress, in sect. 4220 of the Revised Statutes, declares that " No vessel belonging to any citizen of the United States, trading from one port within the United States to another port within the United States, or employed in the bank, whale, or other fisheries, shall be subject to tonnage tax or duty, if such vessel be licensed, registered, or enrolled,"— they mean by the phrases, " duty of tonnage," and " tonnage tax or duty," a charge, tax, or duty on a vessel for the privilege of entering a port; and although usually levied according to tonnage, and so acquiring its name, it is not confined to that method of rating the charge. It has nothing to do with wharfage, which is a charge against a vessel for using or lying

at a wharf or landing.   The one is imposed by the government, the other by the owner of the wharf or landing.   The one is a commercial regulation, dictated by the general policy of the country upon considerations having reference to its commerce or revenue; the other is a rent charged by the owner of the property for its temporary use.   It is obvious that the mode of rating the charge in either case, whether according to the size or capacity of the vessel, or otherwise, has nothing to do with its essential nature.   It is also obvious that since a wharf is property, and wharfage is a charge or rent for its temporary use, the question whether the owner derives more or less revenue from it, or whether more or less than the cost of building and maintaining it, or what disposition he makes of such revenue, can in no way concern those who make use of the wharf and are required to pay the regular charges therefor; provided, always, that the charges are reasonable and not exorbitant.

It is undoubtedly a general rule of law, in reference to all public wharves, that wharfage must be reasonable.   A private wharf, that is, a wharf which the owner has constructed and reserves for his private use, is not subject to this rule; for, if any other person wishes to make use of it for a temporary purpose, the parties are at liberty to make their own bargain. That such wharves may be had and owned, even on a navigable river, is not open to controversy.   It was so decided by this court in *Dutton* v. *Strong*, 1 Black, 23, and in *Yates* v. *Milwaukee*, 10 Wall. 497.   Whether a private wharf may be maintained as such, where it is the only facility of the kind in a particular port or harbor, may be questioned.   Sir Matthew Hale says: "If the King or subject have a public wharf unto which all persons that come to that port must come and unlade or lade their goods as for the purpose because they are the wharves only licensed by the King, according to the statutes of 1 Eliz., cap. 11, or because there is no other wharf in that port, as it may fall out where a port is newly erected; in that case there cannot be taken arbitrary and excessive duties for cranage, wharfage, pesage, &c.; neither can they be inhanced to an immoderate rate, but the duties must be reasonable and moderate, though settled by the King's license or charter."   Hargrave's L. T. 77.

Be this, however, as it may, it is an undoubted rule of universal application that wharfage for the use of all public wharves must be reasonable. But then the 'question arises, by what law is this rule established, and by what law can it be enforced? By what law is it to be decided whether the charges imposed are, or are not, extortionate? There can be but one answer to these questions. Clearly it must be by the local municipal law, at least until some superior or paramount law has been prescribed. At Parkersburg it is the law of West Virginia. The rule referred to is a rule of the common law undoubtedly, but it has force in West Virginia because the common law is the law of that State, and not because it is the law of the United States. The courts of the United States do not enforce the common law in municipal matters in the States because it is Federal law, but because it is the law of the State.

We have said that the reasonableness of wharfage must be determined by the local law until some paramount law has been prescribed. By this we mean, that until the local law is displaced or overruled by paramount legislation adopted by Congress, the courts have no other guide, no other law to administer on the subject than the local or State law. Our system of government is of a dual character, State and Federal. The States retain general sovereignty and jurisdiction over all local matters within their limits; but the United States, through Congress, is invested with supreme and paramount authority in the regulation of commerce with foreign nations and among the several States. This has been held to embrace the regulation of the navigable waters of the United States, of which the Ohio River is one. In the exercise of this authority over navigable waters Congress has, from the commencement of the government, erected light-houses, break-waters, and piers, not only on the sea-coast, but in the navigable rivers of the country; and has improved the navigation of rivers by dredging and cleaning them, and making new channels and jetties, and adopting every other means of making them more capable of meeting the growing and extending demands of commerce. It has extended its supervision in an especial manner to the Ohio River. Amongst other things, it has overcome the obstacle presented by the falls at Louisville by the construction of an

expensive canal.   It has created ports of delivery along the
river, of which the city of Parkersburg itself is one, and others
are at Pittsburgh, Wheeling, Cincinnati, Louisville, Madison,
Jeffersonville, New Albany, Evansville, Paducah, and Cairo.
It has regulated the bridges which have been thrown across the
river by authority of the States.   It authorized the Wheeling
bridge to stand, after this court had declared it to be a nuisance;
requiring the officers of all vessels to regulate their pipes and
chimneys so as not to interfere with the bridge, 10 Stat. 112;
thus extending its common protection to commerce by land and
commerce by water.   It required the Newport and Cincinnati
bridge to be removed or placed at a greater height above the
water, after having been constructed in accordance with the
laws of the States and of the United States.   16 id. 572.

Now wharves, levees, and landing-places are essential to
commerce by water, no less than a navigable channel and a
clear river.   But they are attached to the land; they are pri-
vate property, real estate; and they are primarily, at least,
subject to the local State laws.   Congress has never yet inter-
posed to supervise their administration; it has hitherto left
this exclusively to the States.   There is little doubt, however,
that Congress, if it saw fit, in case of prevailing abuses in the
management of wharf property, — abuses materially interfering
with the prosecution of commerce, — might interpose and make
regulations to prevent such abuses.   When it shall have done
so, it will be time enough for the courts to carry its regulations
into effect by judicial proceedings properly instituted.   But
until Congress has acted, the courts of the United States can-
not assume control over the subject as a matter of Federal cog-
nizance.   It is Congress, and not the Judicial Department, to
which the Constitution has given the power to regulate com-
merce with foreign nations and among the several States.   The
courts can never take the initiative on this subject.

There are cases, it is true, which are so national in their
character, and in which it is so essential that a general or
national rule should exist, that any interference by the State
legislatures therewith is justly deemed to be an invasion of
the power and authority of the general government; and in
such cases the courts will interpose to prevent or redress the

commission of acts done or attempted to be done under the authority of such unconstitutional laws.  In such cases, the non-action or silence of Congress will be deemed to be an indication of its will that no exaction or restraint shall be imposed.  Such is the import of the various passenger cases in which this court has pronounced unconstitutional any tax, duty, or other exaction imposed by the States upon emigrants landing in the country.  Such is also the import of those cases in which it has been held that State laws imposing discriminating burdens upon the persons or products of other States are unconstitutional; it being deemed the intent of Congress that inter-state commerce shall be free, where it has not itself imposed any restrictions thereon.  See *Passenger Cases*, 7 How. 283, 462; *Cooley* v. *Board of Wardens*, 12 id. 299, 319; *Gilman* v. *Philadelphia*, 3 Wall. 713; *Crandall* v. *State of Nevada*, 6 id. 42; *Ward* v. *Maryland*, 12 id. 418, 432; *Case of the State Freight Tax*, 15 id. 232, 279; *Welton* v. *State of Missouri*, 91 U. S. 275; *Henderson* v. *Mayor of New York*, 92 id. 259, 272; *People* v. *Compagnie Générale Transatlantique, ante*, p. 59.

But the case before us is not one of the kind referred to. Though the use of public wharves may be regulated by Congress as a part of the commercial power, it certainly does not belong to that class of subjects which are in their nature national, requiring a single uniform rule, but to that class which are in their nature local, requiring a diversity of rules and regulations.  To quote the words of Mr. Justice Curtis in *Cooley* v. *Board of Wardens*, 12 How. 299, 319, "The power to regulate commerce embraces a vast field, containing not only many, but exceedingly various subjects, quite unlike in their nature; some imperatively demanding a single uniform rule, operating equally on the commerce of the United States in every port; and some, like the subject now in question [which was pilotage], as imperatively demanding that diversity which alone can meet the local necessities of navigation. . . . Whatever subjects of this power are in their nature national, or admit only of one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress.  That this cannot be affirmed of laws

for the regulation of pilots and pilotage is plain.  The act of 1789 contains a clear and authoritative declaration by the first Congress, that the nature of this subject is such, that until Congress should find it necessary to exert its power, it should be left to the legislation of the States; that it is local and not national; that it is likely to be best provided for, not by one system, or plan of regulations, but by as many as the legislative discretion of the several States should deem applicable to the local peculiarities of the ports within their limits."

No words could be more fitly applied to the subject of the regulation of wharves than are here used by the court in reference to pilotage.  It is true no act of Congress has relegated the subject of wharfage to the States, as was done in the case of pilotage ; but this was not necessary : the regulation of wharves belongs *prima facie*, and in the first instance, to the States, and would only be assumed by Congress when its exercise by the States is incompatible with the interests of commerce ; and Congress has never yet assumed to take that regulation into its own hands, or to interfere with the regulation of the States.

The power of the States to legislate in matters of a local character, where Congress has not by its own action covered the subject, is quite fully discussed by Mr. Justice Field in delivering the opinion of this court in *County of Mobile* v. *Kimball*, 102 U. S. 691, where the distinction taken in *Cooley* v. *Board of Wardens*, between those subjects which are national in their character and require uniformity of regulation, and those which are local and peculiar to particular places, is commented upon and enforced.  Amongst other things, it is there said: " Where from the nature of the subject or the sphere of its operation the case is local and limited, special regulations adapted to the immediate locality could only have been contemplated.  State action upon such subjects can constitute no interference with the commercial power of Congress, for when that acts the State authority is superseded.  Inaction of Congress upon these subjects of a local nature or operation, unlike its inaction upon matters affecting all the States and requiring uniformity of regulation, is not to be taken as a dec-

laration that nothing shall be done with respect to them, but is rather to be deemed a declaration that for the time being, and until it sees fit to act, they may be regulated by State authority." See also the remarks of the Chief Justice in *Hall* v. *De Cuir*, 95 U. S. 485.

It is not necessary to cite other cases. The principle laid down in *Cooley* v. *Board of Wardens* has become fully recognized and established in our jurisprudence; and it is manifest that no subject can be more properly classified as local in its nature, and as requiring the application of local regulations, than that of wharves and wharfage.

From this view, it is plain that the courts of the United States have no authority to ignore the State laws and regulations on the subject of wharves and wharfage, and to declare them invalid by reason of any supposed repugnancy to the Constitution or laws of the United States. As already remarked, the courts cannot take the initiative in this matter. Congress must first legislate before the courts can proceed upon any such ground of paramount jurisdiction. If the rates of wharfage exacted are deemed extortionate or unreasonable, the courts of the United States (in cases within their ordinary jurisdiction) as well as the courts of the States must apply and administer the State laws relating to the subject; and these laws will probably, in most cases, be found to be sufficient for the suppression of any glaring evils. At all events, there is not, at present, any Federal law on the subject by which relief can be obtained.

In the various bridge cases that have come before the courts of the United States, where bridges (or dams) have been erected by State authority across navigable streams, the refusal to interfere with their erection has always been based upon the absence of prohibitory legislation by Congress, and the power of the States over the subject in the absence of such legislation. Where the regulation of such streams by Congress has been only of a general character, such as the establishment of ports and collection districts thereon, it has been held that the erection of bridges, furnished with convenient draws, so as not materially to interfere with navigation, is within the power of the States, and not repugnant to such general regulation. The

former cases on this subject are reviewed in *Escanaba Company* v. *Chicago, ante,* p. 678.

It is believed that no case can be found in which State laws, or regulations under State authority, on subjects of a local nature, have been set aside on the ground of repugnance to the power of regulating commerce given to Congress, unless it has appeared that they were contrary to some express provision of the Constitution, or to some act of Congress, or that they amounted to an assumption of power exclusively conferred upon Congress.

In *Gibbons* v. *Ogden* it was held, that, as the navigation of all public waters of the United States is subject to the regulation of Congress, a license granted under the laws and by the authority of the United States to a steamboat to carry on the coasting trade entitled such boat to navigate all such waters, notwithstanding the existence of a State law granting to certain individuals the exclusive right to navigate a portion of said waters lying within the State; and that such exclusive grant was void as being repugnant to the regulation made by Congress.  Chief Justice Marshall, delivering the opinion of the court in that case, said: "The court will enter upon the inquiry, whether the laws of New York, as expounded by the highest tribunal of that State, have, in their application to this case, come into collision with an act of Congress, and deprived a citizen of a right to which the act entitles him."

Subsequent cases which we have already cited in this opinion are to the same effect.  *Crandall* v. *State of Nevada,* 6 Wall. 35; *Ward* v. *Maryland,* 12 id. 418; *Welton* v. *State of Missouri,* 91 U. S. 275; *Henderson* v. *Mayor of New York,* 92 id. 259; *Péople* v. *Compagnie Générale Transatlantique, ante,* p. 59.

State of *Pennsylvania* v. *Wheeling, &c. Bridge Co.,* 13 How. 518, was a peculiar case.  The Wheeling bridge, as originally constructed, presented a complete obstacle to the passage of steamboats with high chimneys, such as navigated the Ohio River to and from Pittsburgh; and hence presented a case of interference with navigation analogous to that of the exclusive monopoly granted to Fulton and Livingston by the State of New York, which was the ground of complaint in the case of

*Gibbons* v. *Ogden.* But, besides this, it was a case in which this court exercised its original jurisdiction by reason of the character of the parties, a State being the complainant; and having jurisdiction on this ground, it was competent for the court to decide upon the lawfulness or unlawfulness of the structure in reference, not only to the laws of the United States, but also to the local municipal law, and to the general law relating to the mutual rights of the States. The charter granted to the Wheeling Bridge Company by the State of Virginia had expressly provided, " that if the said bridge shall be so constructed as to injure the navigation of said river, the said bridge shall be treated as a public nuisance, and shall be liable to abatement upon the same principles and in the same manner that other public nuisances are." In addition to this, an act was passed Dec. 18, 1789, by the State of Virginia, consenting to the erection of the State of Kentucky out of its territory on certain conditions, among which was one " that the use and navigation of the river Ohio, so far as the territory of the proposed State, or the territory that shall remain within the limits of this Commonwealth, lies thereon, shall be free and common to the citizens of the United States ; " and to this the assent of Congress was given by the act of Feb. 4, 1791, c. 4. " This compact," the court said, " by the sanction of Congress, has become a law of the Union." Upon all these grounds, it was held that the State of Pennsylvania, having large interests which were affected by the erection of the bridge, was entitled to a decree for its prostration as a nuisance, unless such alterations should be made in its construction as to leave the navigation of the river unimpaired.

This case, therefore, cannot be relied on, any more than the other cases referred to, to show that the courts of the United States have any peculiar jurisdiction as such to vindicate the supposed rights of commerce and navigation against the laws of the States, in matters of a local nature, such as the regulation of wharfage is, where no express provision of the Constitution is violated, and no act of Congress has been passed to regulate the subject. As no act of Congress has been passed for the regulation of wharfage, and as there is nothing in the Constitution to prevent the States from regulating it, so long

as Congress sees fit to abstain from action on the subject, our conclusion is, that it is entirely within the domain, and subject to the operation, of the State laws.

The effect of this conclusion upon the present case is obvious. The gravamen of the bill is really nothing but a complaint against exorbitant rates of wharfage.    These rates are established by a municipal body, itself the proprietor of the wharves, and professing to act under the authority of State law.    It cannot be supposed that the law authorizes exorbitant charges to be made ; but whether the charges exacted are exorbitant or not can only be determined by that law.    It is clear, therefore, that the complainant in filing its bill in the United States court on the ground that the wharfage complained of is in violation of the Constitution or laws of the United States, has totally misconceived its rights, and the proper means of obtaining redress.    Unless it has some other ground for coming into the Federal court, it must seek redress in the State courts ; and whether the question of reasonableness of wharfage is submitted to the determination of the one forum or the other, it is only determinable by the laws of the State within whose jurisdiction the wharf is situated.    Since the parties are all citizens of West Virginia, and since the case cannot be sustained as one " arising under the Constitution or laws of the United States," there was no error in the decree dismissing the bill of complaint.    The decree of the Circuit Court is, therefore,

*Affirmed.*

MR. JUSTICE HARLAN dissenting.

The city of Parkersburg — which has been created a port of delivery in conformity with the laws of the United States — exacts and collects for the use of its wharf by boats engaged in commerce on the Ohio River certain fees or dues, called wharfage charges, which, pursuant to the ordinance of May 17, 1865, are, in every case, measured by the tonnage or capacity of the boat so using the wharf.

It is conceded by the demurrer to the bill that from these fees the city has long since been reimbursed for the actual cost of constructing the wharf; that the amount annually collected

from boats for its use is largely in excess of any expense incurred in its maintenance and repair; that it has been permitted to become and remain in bad repair, at times almost unfit for use; that nearly all the money so raised is applied by the city to increase its general revenue and pay its indebtedness; and, lastly, that the wharfage charges are unreasonable in amount and oppressive.

The opinion of the court, if I do not wholly misapprehend it, proceeds upon the broad ground that municipal wharfage charges, even where measured by the tonnage of the boat, and however much in excess of fair and reasonable compensation, are not duties of tonnage within the meaning of the Constitution, and that their exaction infringes no right given or secured by the Constitution or the existing statutes of the United States. If, however, such charges are duties of tonnage, or if their collection violates any right, so given or secured, then a case unquestionably arises under the Constitution or laws of the United States, of which the Circuit Court, under the act of March 3, 1875, c. 137, can take original jurisdiction, without reference to the citizenship of the parties.

I had supposed, and am still of opinion, that a vessel or boat, duly enrolled and licensed under the laws of the United States (as those of the appellant are conceded to be), and engaged in commerce upon the Ohio, a public navigable water, is entitled, in virtue of the Constitution and laws of the United States, to enter any port on that river, and also to land at any wharf established for public use, without being subjected (apart from mere police regulations) to any burden, tax, or duty therefor, beyond reasonable compensation to the owner of the wharf for its use.

Such I have understood to be the doctrine announced in *Cannon* v. *New Orleans*, 20 Wall. 577; *Packet Company* v. *Keokuk*, 95 U. S. 80; *Packet Company* v. *St. Louis*, 100 id. 423; *Vicksburg* v. *Tobin*, id. 430.

The court holds that Congress, under the power to regulate commerce with foreign nations and among the several States, may, by statute, provide for the protection, through the courts, of those engaged in commerce upon the public navigable waters of the United States against unreasonable charges for

the use of wharves by boats. But without further legislation, specifically directed to that end, the courts, I submit, should adjudge that local regulations, such as those adopted by the city of Parkersburg, are within the prohibition upon the States to lay any duty of tonnage, and are also inconsistent with the compact between Virginia and Kentucky which this court, in *State of Pennsylvania* v. *Wheeling, &c., Bridge Co.*, 13 How. 518, 564, declared had become, by the sanction of Congress, a law of the Union. In that compact it is declared that " the use and navigation of the river Ohio, so far as the territory of the proposed State, or the territory that shall remain within the limits of this Commonwealth [Virginia], lies thereon, shall be free and common to the citizens of the United States."

In the opinion of the court a duty of tonnage is defined to be a charge, tax, or duty on a vessel for the mere privilege of entering or lying in a port. The city of Parkersburg cannot, therefore, constitutionally impose a charge, tax, or duty upon, or for the exercise of, that privilege. Now, do the Constitution and the existing laws of the United States extend their protection no further than to secure the bare, naked right of entering a port free from local burdens or duties upon its exercise? May not the boat, in virtue of the Constitution and existing laws, also land at any wharf, at least at any public wharf, or the Ohio River for the purpose of discharging and receiving freight and passengers? Of what value would be the right to enter the port without the privilege of landing its passengers and freight? Is not the substantial privilege of landing passengers and freight necessarily involved in the right of entering the port? If so, it would seem that the right to land a boat at a public wharf on a navigable water of the United States is as fully protected by the Constitution and the existing laws of the United States as that of entering the port. A charge, tax, or duty imposed upon the exercise of the right to land is consequently, for every practical purpose, as much a duty of tonnage as a charge, tax, or duty upon the privilege of entering the port. The constitutional provision that " no State shall, without the consent of Congress, lay any duty of tonnage; " the power given Congress to regulate commerce among the States; the statutes of the United States, in the exercise of that

power, providing for licensing vessels, establishing ports of entry, and imposing duties and inflicting penalties upon officers of boats engaged in navigation; and the sanction by Congress of the compact between Virginia, and Kentucky, declaring that the use and navigation of the Ohio River shall be free to all citizens of the United States, — give to the boats of the appellant the right to enter the port of Parkersburg and land at the wharf provided for the use of boats engaged in navigation. It is a right given and secured by the Constitution and the existing laws of the United States, and, therefore, one which the courts of the Union may protect against invasion or violation.

For its protection additional legislation does not seem to be necessary, since the Circuit Court has original jurisdiction of all suits arising under the Constitution and laws of the United States when the matter in dispute exceeds a prescribed amount.

These principles are entirely consistent with the city's ownership of the wharf and with the right to demand fair compensation for its use. As decided in the before-mentioned cases, the city may require all who use its wharf by landing thereat, or in any other way, to pay what such use is reasonably worth. It cannot, as the court states, rightfully demand more. Reasonable compensation for the use by boats of the additional facilities furnished to commerce by means of wharves, even when such compensation is measured by the capacity of the boats, is not, within the meaning of the Constitution and the laws of the United States, an infringement of the right of free commerce upon the public navigable waters of the United States. Upon this ground the wharfage charges imposed by the cities of St. Louis, Vicksburg, and Keokuk were sustained. But it is an entirely different matter when a municipal corporation assumes in effect, if not in terms, to burden the constitutional privilege of entering the port of any city, situated on a public navigable stream, with the condition that if the boats land at the public wharf of that city, it must submit to the payment of larger compensation for the use of that wharf than the corporation has the legal authority to demand. It requires no further legislation by Congress to enable the courts of the Union to protect

the rights of free commerce against exactions of that kind. It is, I think, their duty to adjudge all such local regulations to be in conflict with the supreme law of the land. To burden the exercise of a constitutional right with conditions which materially impair its value, or which, practically, compel the abandonment of the right rather than to submit to the conditions, is, in law, an infringement of that right. The opinion of the court, I repeat, rests necessarily upon the ground that the enforced exaction and collection by a municipal corporation of unreasonable compensation for the use of its wharf by a boat, duly enrolled and licensed under the laws of the United States, and engaged in commerce upon the Ohio River, do not infringe or impair any right given or secured either by the Constitution or the existing laws of the United States. To that proposition I am unable to give my assent.

For the reasons stated, I dissent from the opinion and judgment.