### THE GOLDEN ROD.

#### (District Court, D. Maine. July 8, 1912.)

#### No. 94.

1. COURTS (§ 367*)—STATE LAWS AS RULES OF DECISION IN FEDERAL COURTS.
   A wharf built by an owner of shore land into navigable waters is an extension of the shore and a part of the real estate of the shore owner, and rights therein are governed by the laws of the state, as construed by its highest court, which will be adopted and followed by the federal courts.
   [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 958, 959; Dec. Dig. § 367.*
   State laws as rules of decisions in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

2. WHARVES (§ 16*)—PUBLIC WHARF—RIGHT TO COLLECT WHARFAGE—TENANTS IN COMMON.
   The owner of shore land and a steamboat company procured a license from the town as authorized by state law to build a wharf from such shore, and did so under an oral agreement between themselves. *Held*, on the evidence, that it was intended to be and became a public wharf; that, as to the portion of it below low-water mark, the parties were tenants in common with equal interests, each having the right to use it or to permit others to use it; and that a vessel owner who contracted for its use with one of the cotenants and paid him the customary wharfage could not be held liable to the other for such use.
   [Ed. Note.—For other cases, see Wharves, Cent. Dig. §§ 13–18; Dec. Dig. § 16.*]

In Admiralty. Suit by Islesboro, Belfast & Castine Steamboat Company against the steamer Golden Rod; Eastern Bay Steamboat Company, claimant. Decree for respondent.

Edward C. Plummer, of Bath, Me., and William H. Gulliver, of Portland, Me., for libelant.

Benjamin Thompson, of Portland, Me., and John R. Dunton, of Belfast, Me., for claimant.

HALE, District Judge. The libelant seeks to recover the sum of $880 for wharfage, arising from the use, by the claimant's steamer Golden Rod, of "Tapley's wharf," so called, at Brooksville in this district. The libel alleges that, at the time referred to, the libelant was

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the owner of the wharf, and had the right to recover wharfage from all vessels landing at or making use of it. The answer denies that the libelant was the owner of the wharf, or was entitled to recover wharfage from vessels using it; but admits that its steamer has stopped regularly at it, under an agreement with one Charles P. Tapley, by which the claimant was to pay $5 a month as wharfage; and that this amount had been regularly paid to Tapley.

It appears that in April or May, 1897, Charles P. Tapley, the owner of the real estate off which the wharf was constructed, entered into an oral agreement with Gilford G. Pendleton, the president of the libelant company, respecting the building of a wharf off Tapley's shore; that thereby it was agreed that, if Tapley would build off to low-water mark, the steamboat company would continue for a sufficient distance beyond low-water mark, and construct a head suitable for a steamboat landing. In pursuance of this agreement, Tapley and Pendleton filed with the selectmen a petition under section 96 of chapter 4 of the Revised Statutes of Maine, for permission to erect and maintain a wharf off the Tapley shore. On June 29, 1897, the selectmen issued a license authorizing the steamboat company and Tapley to build and maintain a wharf at the location named. No question has been raised at bar in reference to the legality of these proceedings. Pursuant to this license, Tapley at once proceeded to build a wharf 12 feet wide, extending off shore about 300 feet. At the outer end of Tapley's wharf, the steamboat company built a structure about 50 feet long and 12 feet wide, and, on the end of it, a pier 30 by 50 feet, extending out to a sufficient depth for steamers to land. A small freight shed was built on the outer pier for the storage of freight. About July 1, 1897, the libelant's steamer began running to this wharf, and Tapley was appointed agent to attend to the steamer's lines when she was landing at and leaving the wharf, and to look after the freight. In addition to the libelant's steamer, several other steamers stopped at the wharf. In order to get to the main road from the end of the wharf, passengers had to pass over the part of the wharf built by Tapley, and then cross his field for a distance of about 90 rods. In the spring of 1907, the claimant purchased the steamer Golden Rod; and, soon after, Capt. Smallidge, who had been master of the libelant's steamer, became master of the Golden Rod. Smallidge entered into an agreement with Tapley by which the Golden Rod was to have the right to land at the wharf upon payment of $15 a month, which sum included wharfage at $5 a month, and Tapley's services as agent at $10 a month; and this wharfage has been regularly paid by the claimant to Tapley up to the filing of the libel.

The libelant contends that, under the agreement with Tapley, it had the sole right to use the outer part of the wharf, at which the Golden Rod landed, so long as it kept such outer part in repair, and that it had the sole right to the wharfage. It is contended by the claimant that the libelant was a mere licensee in the wharf; that the wharf was a public one; that Tapley was its owner; that as such he had the right to use it, and to permit others to use it; that the libelant's

license to use Tapley's wharf was terminated by its failure to keep the outer part, or head, of the wharf in repair.

[1] This controversy presents some added difficulties from the fact that the parties acted without advice of counsel, and without any writing between them. There can be no question that, as owner of the shore, Tapley had the right, under permits from the state and federal authorities, to build and maintain a structure off his own shore into navigable water. A wharf thus constructed was merely an "extension of the shore." It was a part of Tapley's real estate. The Ottawa, Fed. Cas. No. 10,616; The Haxby (D. C.) 94 Fed. 1016; The Plymouth, 3 Wall. 20, 18 L. Ed. 125. It is evident, then, that the question thus far relates merely to real estate, and is governed by the laws of the state where such property is situated; the rule in the federal courts being that where state decisions have interpreted state laws governing real property, the federal courts will, when possible to do so, adopt and follow the settled rule of construction adopted by the state court of last resort. They will thus conform their decisions, so far as possible, to the statutes of the state, and to the rule of property within the state. Warburton v. White, 176 U. S. 484, 496, 20 Sup. Ct. 404, 44 L. Ed. 555; Hughes, Federal Procedure, p. 15. There can be no question as to the rule upon this subject in this district. In Maine and Massachusetts the ownership of property on tidewaters extends to low-water mark, not exceeding 100 rods. The owner has a right to improve the shores by the placing of structures thereon, and has always had this right, subject to the consent and approval of the state and federal authorities. Under the title "Liberties," the Colonial Ordinance of Massachusetts in 1641 declared:

"That in all creeks, coves and other places about and upon salt water, where the sea ebbs and flows, the proprietor of the land adjoining shall have propriety to the low-water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further. Provided, that such proprietor shall not, by this liberty, have power to stop or hinder the passage of boats or other vessels, in or through any sea, creeks or coves, to other men's houses or lands."

Under the time-honored provisions of the Colonial Ordinance and the law of this district, there can, then, be no question as to Tapley's ownership of the flats to low-water mark. But what rights the steamboat company and Tapley acquired in the wharf, when constructed pursuant to the terms of the grant from the selectmen of Brooksville, is a question which it is necessary to determine.

In order to permit vessels to land at all stages of the tide, it became necessary to extend the wharf out below low-water mark; and this was authorized by the terms of the grant. Under section 96 of chapter 4 of the Revised Statutes of Maine, selectmen, after hearing, are authorized to determine whether the proposed erection will be an obstruction to navigation, or an injury to the rights of others; and, if they decide to allow the erection and maintenance of the structure, they issue a "license," authorizing its erection and maintenance within the limits mentioned therein. It was clearly the intention of the Legislature, by this statute, to provide a simple and direct way

for citizens to obtain a grant to build and maintain a wharf, when it would not be an obstruction to navigation, nor an injury to the rights of others; and to this end the Legislature authorized citizens to apply to the selectmen of the town in which the proposed wharf is to be located, and to obtain a permit which in the language of the statute is called a "license." This license, however, was clearly more than a license as defined by the early common-law definition, under which it was held that "a license passeth no interest, nor a lease, nor transfers property." It is evident that the license in question, granted by the town of Brooksville to the libelant and Tapley, gave to them as substantial a charter, so far as it goes, as if it had been given by the state itself.

[2] What, then, was the character of the wharf which the parties intended to build, and did build, below low-water mark, under this charter, or so-called "license"? In the leading case upon this subject (Dutton v. Strong, 1 Black. 23, 32 [17 L. Ed. 29]), in speaking for the court, Judge Clifford said:

"Piers and landing places, and even wharves, may be private, or they may be in their nature public, although the property may be in an individual owner; or, in other words, the owner may have, the right to the exclusive enjoyment of the structure, and to exclude all other persons from its use; or he may be under obligation to concede to others the privilege of landing their goods, or of mooring their vessels there, upon the payment of a reasonable compensation as wharfage."

Under the decisions of the Supreme Court, it becomes a material question to decide whether a wharf was intended as a private wharf or a public wharf. A public wharf may be a free wharf. The owner of a wharf may dedicate it to the public as a free wharf. But from the fact of the wharf being public, it does not at all follow that it is *free,* and that it is intended for the public to use it without payment of a reasonable compensation as wharfage. The whole testimony in the case at bar tends to show that the wharf was of a public character; that the business which the libelant and Tapley were intending to do, and which was contemplated in the grant, was of a public character. It is evident that one purpose of Tapley in obtaining the wharf privileges was to insure to himself all benefit which a public landing would bring to his boarding house and livery stable. It is evident, also, that the steamboat company had business reasons for desiring a public wharf at this place. The testimony indicates, too, that the parties shared the general understanding, which people upon the coast of Maine then had, that all wharves are public; that keeping a wharf, like keeping a hotel, confers a general license for all persons to occupy it for lawful purposes. In fact, for many years, the decisions of the courts justified this view, as in Transportation Co. v. Parkersburg, 107 U. S. 691, 699, 2 Sup. Ct. 732, 27 L. Ed. 584; Heaney v. Heaney, 2 Denio (N. Y.) 625; Swords v. Edgar, 59 N. Y. 28, 31, 17 Am. Rep. 295. In 1905, however, the United States Supreme Court made the rights of the owner of a private wharf absolutely clear, by the decision in Louisville & Nashville Railroad Co. v. West Coast Naval Stores Co., 198 U. S. 483,

25 Sup. Ct. 745, 49 L. Ed. 1135, where the court held that the fact that a wharf is built by a railroad company on an extension of a public street under permission of the municipality does not, in the absence of express stipulations, make it a public wharf, or affect the company's right to sole occupancy, or power of regulation. In 1909, in Weems Steamboat Co. v. People's Co., 214 U. S. 345, 355, 29 Sup. Ct. 661, 53 L. Ed. 1024, 16 Ann. Cas. 1222, the court held that a private wharf on navigable waters is not held by the owner, as a railroad is, subject to the public use; a third person has no right to demand its use, even on tendering compensation therefor, and even though there may be no other wharf at that place. In speaking for the court, Mr. Justice Peckham said:

"The rights of a riparian owner upon a navigable stream in this country are governed by the law of the state in which the stream is situated. These rights are subject to the paramount public right of navigation. The riparian proprietors have the right, among others, to build private wharves out so as to reach the navigable waters of the stream. Dutton v. Strong, 1 Black, 23 [17 L. Ed. 29]; Yates v. Milwaukee, 10 Wall. 497 [19 L. Ed. 984]; Transportation Co. v. Parkersburg, 107 U. S. 691, 699 [2 Sup. Ct. 732, 27 L. Ed. 584]; Illinois Central Railroad Co. v. Illinois, 146 U. S. 387, 445 [13 Sup. Ct. 110, 36 L. Ed. 1018]; St. Anthony Falls Water Power Co. v. St. Paul Water Commissioners, 168 U. S. 349, 368 [18 Sup. Ct. 157, 42 L. Ed. 497]. * * * A private wharf on a navigable stream is thus held to be property which cannot be destroyed or its value impaired; and it is property the exclusive use of which the owner can only be deprived in accordance with established law."

After a careful study of the testimony in the case at bar, I am of the opinion that it was the intention of the parties, in building this wharf in tidewaters, that it should be for the use of the public; the users thereof to pay reasonable compensation for the same. It was not intended as a free wharf; and, on the other hand, it was not intended as a wharf to be used exclusively by any one individual or corporation. The evidence shows that as a matter of fact, ever since it was built, the wharf has been in general use by steamboats navigating that locality.

The grant was to Tapley and the steamboat company. For the purposes of this case, it is not necessary to determine whether, under this grant, the libelant acquired any rights in the shore and flats owned by Tapley. But, as to that part of the grant which was below low-water mark, in relation to which the title was necessarily in the state, the so-called "license" gave to Tapley and to the Steamboat Company the rights of the state in the land covered by the wharf. It also gave these parties the right to maintain the structure over that part of the flats owned by Tapley. The grant does not attempt to limit in any way the portion to be constructed or owned by the two parties individually. It must be held, then, that below low-water mark the grant was to the two parties as tenants in common. There is no pretense that Tapley afterwards conveyed to the libelant by deed any interest in the wharf. Under the laws of Maine he could convey orally no estate greater than a tenancy at will, Revised Statutes of Maine, c. 75, § 13. It seems clear, then, that at the time the suit was brought the parties were still tenants in common of the wharf

below low water. For where a conveyance of land is made to two or more persons, and the instrument is silent as to the interest which each is to take, the presumption is that their interests are equal, and that the relation of tenants in common is maintained. Loring v. Palmer, 118 U. S. 321, 341, 6 Sup. Ct. 1073, 30 L. Ed. 211; Higbee v. Rice, 5 Mass. 345, 4 Am. Dec. 63; Carter v. Bailey, 64 Me. 458, 462, 18 Am. Rep. 273. Under the law of Maine, tenants in common hold by several and distinct titles. One tenant in common cannot imperil the interests of his cotenant by creating any servitude or easement upon the property (Morrison v. Clark, 89 Me. 109, 35 Atl. 1034, 56 Am. St. Rep. 395); or by conveying any specific parcel of the common land in severalty, or his proportion of any specific parcel (Frost v. Courtis, 172 Mass. 401, 402, 52 N. E. 515; Peabody v. Minot, 24 Pick. [Mass.] 329). But each tenant in common has the right of possession; he has the right to occupy any part of the common property, and may assign such possessory right to a stranger; he may even occupy the whole without being a trespasser. Although one tenant may not prejudice a companion in the estate, he may receive rents, and may receive also the profits of the freehold. Varnum v. Abbott, 12 Mass. 474, 7 Am. Dec. 87. Each tenant in common has a unity of possession, and is considered to be solely seised of his share. The possession of one tenant is the possession of the other. Each is entitled equally with the other to the entire possession of the whole property and every part of it. No one has exclusive right. Each has the right to occupy the whole, if his cotenant does not choose to enter and occupy with him. In Smith v. Smith, 98 Me. 597, 599, 57 Atl. 999, in speaking for the court, Mr. Justice Whitehouse (now Chief Justice) said:

"With respect to his undivided share, each cotenant has substantially all the rights which a tenant in severalty would have, except that of sole and exclusive possession. It is entirely competent for one tenant in common to make a lease of his undivided share to his cotenant, and he may contract with him for that purpose as with a stranger."

In Badger v. Holmes, 6 Gray (Mass.) 118, it appeared that the plaintiff and Lemuel Cushing owned in common the premises in question. In October, 1846, Cushing leased his interest to the defendant, who entered under the lease, and occupied the whole of the premises, paying rent to no one but Cushing. In 1848 the plaintiff notified the defendant of his interest in the premises, and demanded rent. The defendant refused to pay, and never in any way became a tenant of the plaintiff, and never objected to his occupancy of the premises. And the plaintiff never made any claim to be admitted into possession of the premises or of any part thereof. In speaking for the court, Mr. Justice Bigelow said:

"Nothing is better settled than the rule that the mere occupation of premises owned in common, by one of the tenants in common, does not entitle his cotenant to call him to account, or render him in any way liable to an action for the use and occupation of the estate. Each owns the estate per mi et per tout. If a cotenant does not see fit to come in and occupy, the other still has the right to the enjoyment of the estate; and in such case the sole occupation of one is not an exclusion of the other. Each tenant, being seized of each and every part and parcel of the estate, has a right to the use and

enjoyment of it; and so long as he does not hold his cotenant out, or in any way deprive him of the occupation of the estate, he exercises only a legal right, and receives nothing for which he is bound to account to his cotenant. * * * The plaintiff can claim *no other or greater rights against the defendant, as lessee of his cotenant, than against the cotenant himself.* In fact, to the extent of the term granted by the lessee, the defendant is the cotenant of the plaintiff. Having occupied only according to his title * * * (120). The relation of landlord and tenant does not subsist between the parties. The defendant is in by a separate and independent title; and there is neither privity of contract or privity of estate beween him and the plaintiff, on which to maintain an action for the use and occupation of the premises."

In the case at bar, the whole evidence leads me to the conclusion that the libelant and Tapley were tenants in common of the outer part or head of the wharf; the portion lying below low-water mark. Each had the right to use, and to permit others to use, this wharf. The Revised Statutes of Maine assume such right. Chapter 97, § 20, provides:

"If any one or more of the joint tenants in common take the whole rents or income in the joint estate, or more than their share, without the consent of their cotenants, and refuse, for a reasonable time after demand, to pay such cotenants their share thereof, any one or more of them may have an action of special assumpsit against the refusing cotenants, to recover their proportion thereof."

It is evident, then, that if one tenant in common received more than his share from the use of the wharf, the other had his full and complete remedy.

The claimant's use of the wharf was under an agreement with Tapley, one of the cotenants; and it is clear that Tapley was in the exercise of his rights in making such agreement. Such use of the wharf did not injuriously affect its use by the libelant; for the steamers of the libelant and claimant landed at the wharf only for the landing and receipt of passengers and freight, and then continued on their respective routes.

There was no privity between the libelant and the claimant as the other cotenant of the wharf. The testimony shows that Tapley paid the libelant, and his cotenant, the first month's wharfage which was collected from the claimant's steamer; Tapley has produced his accounts to show, as he testifies, that he had given his cotenant "credit for it"; and the libelant has had knowledge of the payment of the rent to Tapley.

The evidence also shows that the use of the wharf by the claimant and the compensation it has paid therefor were agreed upon before the Golden Rod used it; that the wharfage was the customary wharfage in that locality; that the amount agreed upon has been regularly paid; that the greater part of the rent so received has been expended by Tapley in the repairs upon the outer part of the wharf; that during the same time the libelant has had the use of the wharf in its business without making repairs on it, and has thereby had the full benefit of the expenditure of the moneys received by Tapley. But even if the libelant has not received its full share of such income, it has a remedy under the laws of Maine.

The libel is dismissed, with costs.