# HARMAN v. CHICAGO.

ERROR TO THE SUPREME COURT OF THE STATE OF ILLINOIS.

No. 1022. Submitted January 9, 1893. — Decided January 23, 1893.

The ordinance of the city of Chicago, imposing a license tax for the privilege of navigating the Chicago River and its branches upon steam tugs licensed by the United States authorities under the provisions of Rev. Stat. § 4321, is an unconstitutional exercise of municipal authority, and is invalid.

*Huse* v. *Glover*, 119 U. S. 543, and *Sands* v. *Manistee Improvement Co.*, 123 U. S. 288, each distinguished from this case.

THIS was an action against the city of Chicago, Illinois, to recover the sum of three hundred dollars paid by the plaintiff on compulsion, and under protest, for licenses for twelve steam tugs of which he was the manager and owner. The action was commenced in the Circuit Court of Cook County, Illinois, and was tried by the court without the intervention of a jury, by stipulation of parties. At the trial the plaintiffs put in evidence the following agreed statement of facts:

" It is hereby stipulated and agreed that for the purpose of determining the right of the defendant to require of the plaintiff a license, and to impose and collect a fine or license fee therefor, under an ordinance of the said defendant, hereinafter set forth, the following are the ultimate facts under which the said license was required, and the fine or license fee imposed and collected, viz.: That on the 26th day of September, 1888, the said plaintiff was the owner and manager of the following steam tugs, viz.: Tom Brown, F. S. Butler, J. H. Hackley, C. W. Parker, Bob Teed, A. B. Ward, W. H. Wolf, Crawford, G. B. McClellan, Mary McLane, Success and Wahbun; that said tugs, and each of them, were of twenty tons burden and upwards, and were on the said date and for long time prior thereto had been enrolled and licensed for the coasting trade in pursuance of and under the provisions of ' Title L' of the Revised Statutes of the United States, to which reference is hereby made and which are made a part hereof; that prior to the date aforesaid and on the 5th day of March, 1883, the common council of said city of Chicago, acting under the power supposed to be vested in it by chapter 24 of the Revised Statutes of the State of Illinois, and under which the said city was at said time incorporated, passed and enacted an ordinance regulating the navigation of steam tugs and other vessels on Chicago River and Lake Michigan and the waters tributary thereto, requiring that the owner thereof take out a license therefor, and imposing upon him a fine or penalty for failing so to do, which said ordinance is in the words and figures following:

" Be it ordained by the city council of the city of Chicago:

" SEC. 1. No person or persons shall keep, use or let for hire any tug or steam barge or tow-boat, for towing vessels or craft in the Chicago River, its branches or slips connecting therewith, without first obtaining a license therefor in the manner and way hereinafter mentioned.

" SEC. 2. All applications for such license shall be made to the mayor, and upon payment of twenty-five ($25) dollars to the city collector, a license shall be issued for the period of one year by the city clerk for such tug, or steam barge or

tow-boat, and it shall be the duty of the city clerk to keep a register of the name of the person to whom such license is granted or transferred, the day when issued or transferred, the number of the license, and the name and description of the tug so licensed.

"SEC. 3. Every tug or steam barge or tow-boat shall have the number of the license and the name of the owner marked on both sides of such tug, or steam barge or tow-boat, in plain, legible figures and letters.

"SEC. 4. Any individual or person violating any provisions of this ordinance shall be subject to a fine of not less than five dollars ($5) nor more than fifty dollars ($50) for each offence.

"SEC. 5. This ordinance shall be in force from and after its passage.

"That said steam tugs were enrolled and licensed in the manner and for the purpose aforesaid, by the United States authorities in and at the Northern District of Illinois, in which the said defendant, the said city of Chicago, is situated, and were on the 26th day of September, 1888, and for a long time prior thereto had been engaged in the coasting and foreign trade, and in commerce and navigation, namely, in towing vessels engaged in interstate commerce into and out of the Chicago River and harbor from and to said Lake Michigan, and in pursuance of the conduct of the said trade, were navigating the said Chicago River and the waters of Lake Michigan, and the tributaries thereto, which said river is from time to time deepened for navigation purposes by dredging under the direction and at the expense of said city of Chicago.

"That on the said day the said city collector of the said city of Chicago, the defendant herein, notified the said plaintiff to apply for and take out a license in pursuance of the requirements of the said ordinance for each of said steam tugs, and to pay therefor the sum of twenty-five dollars for each of said tugs, or the sum of three hundred dollars in the aggregate; that the said plaintiff thereupon notified the said collector that the said steam tugs, and each of them, were licensed for the coasting trade, in pursuance of and in accordance with the requirements of the laws of the said United

States, and were engaged in said trade on the said. Chicago River and said Lake Michigan, and the waters tributary thereto, in the manner as aforesaid, and thereupon claimed to the said collector that the said ordinance was invalid, and that the said city of Chicago had no power or authority to require the said plaintiff to take out a license in pursuance of the requirements of the said ordinance, or to pay the said fee, whereupon the said collector of the said defendant caused the said plaintiff to be arrested upon a warrant issued for that purpose, and that while the said plaintiff was under arrest he paid the said license fee under protest, and took out the license as required by the said ordinance, and as demanded of him by the said collector, which said license was thereupon issued to him.

"That the amount of the fees so as aforesaid paid to the said collector for the said defendant was the sum of three hundred dollars; that the said sum was paid by the said collector into the treasury of the said defendant, the said city of Chicago, and that the questions which arise on the foregoing state of facts are as follows, viz.:

"1st. Whether or not the said defendant can require the plaintiff to take out the license and collect therefor the fees provided for in the ordinance aforesaid.

"2d. Whether there was vested in the defendant the power to require of the plaintiff the license and fee provided for in the ordinance aforesaid, and in the manner shown by the foregoing state of facts.

"3d. Whether the said ordinance under which said license was required and the said fee was imposed and collected, is legal and binding upon the plaintiff.

"4th. Whether the plaintiff is not entitled to judgment for the amount of fees so paid by him as aforesaid.

"It is hereby further stipulated that the said facts may be presented to the court and tried under the pleadings as they now stand, and that an order may be entered in said suit, submitting the same to the Honorable Richard S. Tuthill for trial without the intervention of a jury, and that either party shall have the right to appeal from the decision and final judgment of the court herein in the same manner and to the same ex-

tent as they would have if the same case had been tried in the usual and ordinary way."

And there was also introduced in evidence on behalf of the defendant in error an ordinance of the city council of the city of Chicago, in the words and figures as follows :

"SEC. 1. The inhabitants of all that district of country in the county of Cook and State of Illinois, contained within the limits and boundaries hereinafter prescribed, shall be a body politic, under the name and style of the city of Chicago ; and by that name sue and be sued, complain and defend, in any court ; make and use a common seal, and alter at pleasure ; and take and hold, purchase, lease and convey such real and personal or mixed estate as the purposes of the corporation may require, within or without the limits aforesaid.

" SEC. 2. The corporate limits and jurisdiction of the city of Chicago shall embrace and include within the same all of township thirty-nine north, range fourteen east of the third principal meridian, and all of sections thirty-one, thirty-two, thirty-three and fractional section thirty-four, in township forty north, range fourteen east of the third principal meridian, together with so much of the waters and bed of Lake Michigan as lies within one mile of the shore thereof, and east of the territory aforesaid.

" SEC. 3. All that portion of the aforesaid territory lying north of the centre of the main Chicago River and east of the centre of the north branch of said river shall constitute the north division of said city ; all that portion of the aforesaid territory lying south of the centre of the main Chicago River, and south and east of the centre of the south branch of said river and of the Illinois and Michigan Canal, shall constitute the south division of said city ; and all that portion of the aforesaid territory lying west of the centre of the north and south branches of said river and of the Illinois and Michigan Canal shall constitute the west division of said city."

On the trial of the case the issues were found for the defendant ; thereupon an appeal was taken to the appellate court for the First District of the State of Illinois, and there without argument the judgment was affirmed, and then an appeal was

taken by the plaintiff to the Supreme Court of the State. Upon a hearing before that court the judgment of the court below was reversed, and the ordinance of the city declared to be invalid; but upon petition a rehearing was granted, and the case was reargued. After such reargument the judgment previously rendered by the court was set aside and the judgment of the appellate court was affirmed. The plaintiff thereupon brought the case to this court upon a writ of error.

*Mr. C. E. Kremer* and *Mr. D. J. Schuyler* for plaintiff in error.

*Mr. John S. Miller* for defendant in error.

It is agreed that the Chicago River is from time to time deepened for navigation purposes, by dredging under the direction and at the expense of the city. The Supreme Court of the State, in its opinion in this case sustaining the ordinance as valid, based its decision upon the ground that as the Chicago River had been improved as a waterway by the city of Chicago at its expense, the license fee is to be sustained as a payment exacted by the city by way of an equivalent or compensation for the use of the improved waterway so provided by the city.

If this license fee can, by a reasonable construction of the ordinance, and by the facts in the case, be regarded as a mode of exacting compensation for benefits conferred by the city in providing an improved waterway, it should be sustained. There can be no question that the imposition of such a fee is a proper mode of exacting such compensation. *Cincinnati* v. *Bryson*, 15 Ohio, 625; *St. Louis* v. *Green*, 7 Mo. App. 468; *Frommer* v. *Richmond*, 31 Gratt. 646; *Charleston* v. *Pepper*, 1 Rich. (Law), 364.

The license fee exacted in this case can be sustained as an exaction or compensation for the benefits conferred by the improvement by the city of Chicago of the waters in question over which the jurisdiction of the city extends. In such cases it has been settled by the repeated decisions of this court that

the tolls or compensation exacted are to be sustained as a reasonable equivalent for such benefits conferred, and that they are in no sense an improper interference with commerce. *Huse* v. *Glover*, 119 U. S. 543; *Packet Co.* v. *Keokuk*, 95 U. S. 80; *Sands* v. *Manistee River Improvement Co.*, 123 U. S. 288; *Transportation Co.* v. *Parkersburg*, 107 U. S. 691; *Escanaba Co.* v. *Chicago*, 107 U. S. 678; *Morgan's Steamship Co.* v. *Louisiana*, 118 U. S. 455; *Cooley* v. *Board of Wardens of Philadelphia*, 12 How. 299.

It can make no difference what form the compensation is made to take — whether as toll, or wharfage or license fee. The gist of the question is, whether the charge made can be regarded and sustained as compensation for benefits conferred by the authority imposing the charge.

The constitutional power of the several States to improve navigable waters lying within their boundaries, and to charge all vessels navigating such improved waterways reasonable tolls or compensation for their use in their improved condition, is not only supported by the decisions of this court but by many decisions of the state courts. A large number of these cases are referred to in the opinion of the Supreme Court of Illinois in this case, not yet reported, but which will be found in the record.

The Chicago River and harbor of the city of Chicago lie within the territorial limits and jurisdiction of the city. A large portion of the harbor of Chicago is the Chicago River. And the record shows that the Chicago River is from time to time deepened for purposes of navigation, under the direction and at the expense of the city of Chicago.

This court will take judicial notice of the condition and navigability of waters. "We are supposed to know judicially the principal features of the geography of our country, and, as a part of it, what streams are public navigable waters of the United States." *The Montello*, 11 Wall. 411, 414. Equally so will the court take notice of the former navigability and non-navigability of public waters. *Escanaba Co.* v. *Chicago*, 107 U. S. 678.

It would seem very clearly to appear that the navigability

of the Chicago River has been secured almost entirely by the expenditure of municipal funds; that not only have the proprietors of tug boats been furnished with added convenience for the transaction of their business, but that the facilities for the transaction of their business have been furnished by the city of Chicago; that these boats never could have so operated upon the waters of the Chicago River as they originally were, and that the amount of compensation required by the city is so small as to have occasioned no complaint, even on the part of plaintiff in error.

In the respects above suggested, this case is totally unlike any of the cases in which it was held that the exactions sought to be imposed were unauthorized; and is similar to those cases in which it was held that the exaction could be collected for conveniences furnished; not only so, but this case is more strongly in favor of the city than any of the authorities cited by either party. For not only have these tug owners enjoyed added conveniences, but they have constantly made use of that condition of navigability which was furnished largely by the expenditure of the city's money, and without which they could have had no such opportunity to carry on their business at all.

None of the cases cited by the counsel for plaintiff in error, (such as: *Moran* v. *New Orleans,* 112 U. S. 69; *Robbins* v. *Shelby County,* 120 U. S. 489; *Leloup* v. *Mobile,* 127 U. S. 640; *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U. S. 18; *Pickard* v. *Pullman Southern Car Co.,* 117 U. S. 34; *Maine* v. *Grand Trunk Railway,* 142 U. S. 217,) in any way involved the question of the right of the States (or of the local municipalities, under a grant of power from the State,) to exact a compensation for the use of navigable rivers or harbors, within their limits, by them improved, from vessels or boats engaged in interstate commerce or enrolled and licensed under the acts of Congress. The line of decisions referred to do not touch upon or in any way involve the principles involved in this case and laid down in the line of decisions in this court, of which *Huse* v. *Glover* and *Sands* v. *Manistee Co.* are examples.

MR. JUSTICE FIELD, after stating the case, delivered the opinion of the court.

The question presented for determination is the validity of the ordinance of the city of Chicago exacting a license from the plaintiff for the privilege of navigating the Chicago River and its branches by tug-boats owned and controlled by him. The Chicago River is a navigable stream, and its waters connect with the harbor of Chicago, and the vessels navigating the river and harbor have access by them to Lake Michigan, and the States bordering on the lake and connecting lakes and rivers. The tugs in question, from the owner of which the license fees were exacted, were enrolled and licensed in the coasting trade of the United States, under the provisions of the Revised Statutes prescribing the conditions of such license and enrolment. The license is in the form contained in section 4321 of the Revised Statutes, in Title L, under the head of "The Regulations of Vessels in Domestic Commerce." It declares that William Harmon, managing owner, of Chicago, having given bond that the steam tug (naming it and her tonnage,) shall not be employed in any trade while this license shall continue in force, whereby the revenue of the United States shall be defrauded, and having also sworn that this license shall not be used for any other vessel, nor for any other employment than herein specified, the license is hereby granted for such steam tug (naming it,) to be employed in carrying on the coasting and foreign trade, for one year from the date thereof. The license is given by the collector of customs of the district, under his hand and seal. The licenses for the several tugs were in this form, differing from each other only in the name of the tug licensed and its tonnage. The licenses confer a right upon the owner of the steam tugs to navigate with them the rivers and the waters of the United States for one year, which includes the river and harbor of Chicago, Lake Michigan, and connecting rivers and lakes. It appears from the record that at the time the license fees in controversy were exacted, these tugs were actually engaged in the coasting and foreign trade, and in towing vessels engaged in interstate com-

merce, from Lake Michigan to the Chicago River and its branches, and in towing vessels similarly engaged from the river into the lake.

In *Gibbons* v. *Ogden*, 9 Wheat. 1, 213, this court held that vessels enrolled and licensed pursuant to the laws of the United States, as these tugs were, had conferred upon them as full and complete authority to carry on this trade as it was in the power of Congress to confer.

The language of the court in that case respecting the first section of the act then under consideration is equally applicable to the provisions of section 4311 of Title L of the Revised Statutes. This latter section declares that "vessels of twenty tons and upward, enrolled in pursuance of this Title, and having a license in force, or vessels of less than twenty tons, which, although not enrolled, have a license in force as required by this Title, and no others, shall be deemed vessels of the United States, entitled to the privileges of vessels employed in the coasting trade or fisheries." The first section of the act mentioned in *Gibbons* v. *Ogden* is substantially the same as the above section 4311, and, referring to the privileges conferred by it, the court said: "These privileges cannot be separated from the trade, and cannot be enjoyed, unless the trade may be prosecuted. The grant of the privilege is an idle, empty form, conveying nothing, unless it convey the right to which the privilege is attached, and in the exercise of which its whole value consists. To construe these words otherwise than as entitling the ships or vessels described, to carry on the coasting trade, would be, we think, to disregard the apparent intent of the act."

The business in which the tugs of the plaintiff were engaged is similar to that of the vessels mentioned in *Foster* v. *Davenport*, 22 How. 244. In that case a steamboat was employed as a lighter and tow-boat in waters in the State of Alabama. It was, therefore, insisted that she was engaged exclusively in domestic trade and commerce, and consequently the case could be distinguished from the preceding one of *Sinnot* v. *Davenport*, 22 How. 227, argued with it, in which a law of Alabama, passed in 1854, requiring the owners of steamboats navigating

the waters of the State, before leaving the port of Mobile, to file a statement in writing in the office of the probate judge of Mobile County setting forth the name of the vessel, the name of the owner or owners, his or their place or places of residence, and the interest each had in the vessel, was held to be in conflict with the act of Congress passed in February, 1793, so far as the State law was brought to bear upon a vessel which had taken out a license, and was duly enrolled under the act of Congress for carrying on the coasting trade. But Mr. Justice Nelson, speaking for the court, replied as follows: "It is quite apparent, from the facts admitted in the case, that this steamboat was employed in aid of vessels engaged in the foreign or coastwise trade and commerce of the United States, either in the delivery of their cargoes, or in towing the vessels themselves to the port of Mobile. The character of the navigation and business in which it was employed cannot be distinguished from that in which the vessels it towed or unloaded were engaged. The lightering or towing was but the prolongation of the voyage of the vessels, assisted to their port of destination. The case, therefore, is not distinguishable in principle from the one above referred to."

In the present case a neglect or refusal of the owner of the tugs to pay the license required by the ordinance subjects him to the imposition of a fine. His only alternative is to pay the fine, or the use of his tugs in their regular business will be stopped. Of course, the ordinance, if constitutional and operative, has the effect to restrain the use of the vessels in the legitimate commerce for which they are expressly licensed by the United States. It would be a burden and restraint upon that commerce, which is authorized by the United States, and over which Congress has control. No State can interfere with it, or put obstructions upon it, without coming in conflict with the supreme authority of Congress. The requirement that every steam tug, barge or tow-boat, towing vessels or craft for hire in the Chicago River or its branches shall have a license from the city of Chicago, is equivalent to declaring that such vessels shall not enjoy the privileges conferred by the United States, except upon the conditions imposed by the

city. This ordinance is, therefore, plainly and palpably in conflict with the exclusive power of Congress to regulate commerce, interstate and foreign. The steam tugs are not confined to any one particular locality, but may carry on the trade for which they are licensed in any of the ports and navigable rivers of the United States. They may pass from the river and harbor of Chicago to any port on Lake Michigan, or other lakes and rivers connected therewith. As justly observed by counsel: The citizen of any of the States bordering on the lakes who with his tug-boat, also enrolled and licensed for the coasting trade, may wish to tow his or his neighbor's vessel, must, according to the ordinance, before he can tow it into Chicago River, or any of its branches, obtain a license from the city of Chicago to do so. The license of the United States would be insufficient to give him free access to those waters.

In *Moran* v. *New Orleans*, 112 U. S. 69, 74, a law of Louisiana authorized the city of New Orleans to levy and collect a license upon all persons pursuing any trade, profession or calling, and to provide for its collection, and the council of that city passed an ordinance to establish the rate of licenses for professions, callings and other business for the year 1880, and, among others, provided that every member of a firm or company, other agency, person or corporation, owning and running tow-boats to and from the Gulf of Mexico, should pay a license fee of $500. The owner of two steam propellers, measuring over one hundred tons, duly enrolled and licensed at the port of New Orleans under the law of the United States, for the coasting trade, employed them as tug-boats in taking vessels from the sea up the river to New Orleans, and from that port to the sea. The city of New Orleans brought an action against him to recover the license under the ordinance, and obtained a judgment in its favor, which, on appeal, was affirmed by the Supreme Court of the State. Being brought to this court the judgment was reversed, with directions to the court below to dismiss the action of the city. In deciding the case this court, speaking by Mr. Justice Matthews, said of the license exacted : " It is a charge explicitly made as

the price of the privilege of navigating the Mississippi River, between New Orleans and the Gulf, in the coastwise trade, as the condition on which the State of Louisiana consents that the boats of the plaintiff in error may be employed by him according to the terms of the license granted under the authority of Congress. The sole occupation sought to be subjected to the tax is that of using and enjoying the license of the United States to employ these particular vessels in the coasting trade; and the State thus seeks to burden with an exaction, fixed at its own pleasure, the very right to which the plaintiff in error is entitled under, and which he derives from, the Constitution and laws of the United States. The Louisiana statute declares expressly that if he refuses or neglects to pay the license tax imposed upon him for using his boats in this way, he shall not be permitted to act under and avail himself of the license granted by the United States, but may be enjoined from so doing by judicial process. The conflict between the two authorities is direct and express. What the one declares may be done without the tax, the other declares shall not be done except upon payment of the tax. In such an opposition, the only question is, which is the superior authority? and reduced to that, it furnishes its own answer."

In the light of these decisions, and many others to the same effect might be cited, there can be no question as to the invalidity of the ordinance under consideration unless its validity can be found in the alleged expenditures of the city of Chicago in deepening and improving the river. It is upon such alleged ground that the court below sustained the judgment and upheld the validity of the ordinance, and it is upon that ground that it is sought to support the judgment in this court.

The decisions of this court in *Huse* v. *Glover*, 119 U. S. 543, and in *Sands* v. *Manistee River Improvement Co.*, 123 U. S. 288, are particularly referred to and relied upon. The attempt is made to assimilate the present case to those cases from the fact that it is conceded that the Chicago River is from time to time deepened for navigation purposes by dredging under the direction and at the expense of the city. The license fee pro-

vided for in the ordinance of the city is treated as in the nature of a toll or compensation for the expenses of deepening the river. But the plain answer to this position is that the license fee is not exacted upon any such ground, nor is any suggestion made that any special benefit has arisen or can arise to the tugs in question by the alleged deepening of the river. The license is not exacted as a toll or compensation for any specific improvement of the river, of which the steam barges or tugs have the benefit, but is exacted for the keeping, use or letting to hire of any steam tug, or barge or tow-boat, for towing vessels or craft into the Chicago River, its branches or slips connected therewith. The business of the steam barge or tow-boat is to aid the movement of vessels in the river and its branches and adjacent waters; that is, to aid the commerce in which such vessels are engaged.

As said by this court in *Foster* v. *Davenport*, 22 How. 244, from which we have quoted above, the character of the navigation and business in which the steam barges or tug-boats are employed cannot be distinguished from that in which the vessels towed are engaged. In *Huse* v. *Glover*, 119 U. S. 543, 548, the legislature of Illinois had, by various acts, adopted measures for improving the navigation of the Illinois River, including the construction of a lock and dam at two places on the river, and for that purpose created a board of canal commissioners and invested them with authority to superintend the construction of the locks and canals, to control and manage them after their construction, and to prescribe reasonable rates of toll for the passage of vessels through the locks. The works were constructed at an expense of several hundred thousand dollars, which was borne principally by the State, although the United States bore a part of it, sufficient to testify to their consent and approval of the work; and the commissioners prescribed rates of toll for the passage of vessels through the locks, the rates being fixed per ton according to the tonnage measurement of the vessels and the amount of freight carried. Certain parties engaged in the ice trade, and employing several vessels in transporting ice on the river and thence by the Mississippi and other navigable streams to St. Louis and other

Southern markets, all of which vessels were licensed and registered under the act of Congress, filed a bill alleging that, prior to the construction of the dams, the complainants were able to navigate the river without interruption, except such as was incident to the ordinary use of the channel in its natural state; that said dams were an impediment to the free navigation of the river; that for the construction of the locks they were charged and paid duties upon the tonnage measurement of their steamboats and other vessels, amounting to about five thousand dollars; and that similar charges would be made upon subsequent shipments. And the bill alleged that the imposition of the tolls and tonnage duties was in violation of article four of the ordinance for the government of the territory of the United States northwest of the Ohio River, passed July 13, 1787, which provides "that the navigable waters leading into the Mississippi and St. Lawrence and the carrying places between the same shall be a common highway and forever free, as well to the inhabitants of the territory as to citizens of the United States, and those of any other State that may be admitted into the confederacy without any tax, impost or duty therefor," and of the article of the Constitution prohibiting the imposition of a tonnage duty by any State without the consent of Congress. The bill therefore prayed that the canal commissioners and persons acting under them might be restrained from exacting any tonnage duties or other charges for the passage of their steamboats or barges and other vessels used by them in navigating the Illinois River, and from interfering in any manner with the free navigation of the river in the course of their business. The Circuit Court of the United States sustained the validity of the statute and this court affirmed its judgment. In its opinion this court said:

"The exaction of tolls for passage through the locks is as compensation for the use of artificial facilities constructed, not as an impost upon the navigation of the stream. The provision of the clause that the navigable streams should be highways without any tax, impost or duty, has reference to their navigation in their natural state. It did not contemplate that such navigation might not be improved by artificial means, by

the removal of obstructions, or by the making of dams for deepening the waters, or by turning into the rivers waters from other streams to increase their depth. For outlays caused by such works the State may exact reasonable tolls. They are like charges for the use of wharves and docks constructed to facilitate the landing of persons and freight, and the taking them on board, or for the repair of vessels.

"The State is interested in the domestic as well as in the interstate and foreign commerce conducted on the Illinois River; and to increase its facilities, and thus augment its growth, it has full power. It is only when, in the judgment of Congress, its action is deemed to encroach upon the navigation of the river as a means of interstate and foreign commerce, that that body may interfere and control or supersede it. If, in the opinion of the State, greater benefit would result to her commerce by the improvements made than by leaving the river in its natural state — and on that point the State must necessarily determine for itself — it may authorize them, although increased inconvenience and expense may thereby result to the business of individuals. The private inconvenience must yield to the public good."

We adhere to the doctrine thus declared. It was not new when stated in the case mentioned. It had been often announced, though, perhaps, not with as much fulness. That case differs essentially from the one before us. It pointed out distinctly the nature of the improvement; the benefit which it extended to vessels was readily perceptible, and no principle was violated, and no control of Congress over commerce, interstate or foreign, was impaired thereby. Congress, by its contribution to the work, had assented to it. The navigation of the river was improved and facilitated, and those thus benefited were required to pay a reasonable toll for the increased facilities afforded. Nothing of this kind is mentioned for consideration in the ordinance of Chicago. The license fee is a tax for the use of navigable waters, not a charge by way of compensation for any specific improvement. The grant to the city under which the ordinance was passed is a general one to all municipalities of the State. Waters navigable in

themselves in a State, and connecting with other navigable waters so as to form a waterway to other States or foreign nations, cannot be obstructed or impeded so as to impair, defeat or place any burden upon a right to their navigation granted by Congress. Such right the defendants had from the fact that their steam barges and towboats were enrolled and licensed, as stated, under the laws of the United States.

The case of *Sands* v. *Manistee River Improvement Co.*, 123 U. S. 288, does not have any bearing upon the case under consideration. The Manistee River is wholly within the State of Michigan, and its improvement consisted in the removal of obstacles to the floating of logs and lumber down the stream, principally by the cutting of new channels at different points and confining the waters at other points by embankments. The statute under which the improvement company was organized contained various provisions to secure a careful consideration of the improvements proposed and of their alleged benefit to the public, and, if adopted, their proper construction, and also for the establishment of tolls to be charged for their use. When the case came before this court it was held that the internal commerce of a State, that is, the commerce which is wholly confined within its limits, is as much under its control as foreign or interstate commerce is under the control of the general government, and, to encourage the growth of that commerce and render it safe, States might provide for the removal of obstructions from their rivers and harbors and deepen their channels and improve them in other ways, and levy a general tax or toll upon those who use the improvements to meet their cost, provided the free navigation of the waters, as permitted by the laws of the United States, was not impaired, and provided any system for the improvement of their navigation instituted by the general government was not defeated. No legislation of Congress was, by the statute of Michigan, in that case interfered with, nor any right conferred, under the legislation of Congress, in the navigation of the river by licensed or enrolled vessels, impaired, defeated or burdened in any respect. It was the improvement of a river wholly within the State, and, therefore,

until Congress took action on the subject, wholly under the control of the authorities of the State. *County of Mobile* v. *Kimball*, 102 U. S. 691, 699; *Escanaba Co.* v. *Chicago*, 107 U. S. 678.

It follows from the views expressed that the judgment of the Supreme Court of Illinois should have been for the plaintiff below, the plaintiff in error here. Its judgment will, therefore, be

*Reversed and the cause remanded to that court for further proceedings not inconsistent with this opinion.*