DECISION
The defendant, Brian E. Turnbaugh, has been charged, by way of criminal complaint made by the Department of Environmental Management, with violating § 46-22-4(2)(b) and § 46-22-19 of the General Laws. Defendant has moved to dismiss the complaint on the grounds that § 46-22-4 is preempted by federal legislation and thus violates the Supremacy Clause of the United States Constitution, Art. 6, cl. 2. Turnbaugh also alleges that §46-22-4 purports to levy a tonnage tax or licensing fee on his vessel solely for the privilege of entering in and remaining upon the waters of the state and violates Art. 1, Section 10, cl. 3 of the Constitution of the United States which forbids the laying of a "duty of tonnage" by any state without the express permission of Congress. Finally, defendant maintains the licensing fee is an impermissible burden upon interstate commerce, U.S. Const. Art. 1, § 8, cl. 3.
The facts of this case are largely undisputed. Brian E. Turnbaugh, a resident of Rhode Island, is presently and has been since March 23, 1984, the owner of the vessel, "All Maine Woman," an oil screw home ported in Boston, Massachusetts. This vessel is documented and endorsed for "Fishery" and possesses a Certificate of Documentation as required by Federal law. Its official number is 557344, its Gross Tonnage is 44 tons, Net Tonnage is 30 Tons and the State alleges its length to be in excess of 50 feet.
Both Defendant Turnbaugh and the "All Maine Woman" have been issued federal fishery licenses which permit Turnbaugh and his vessel to engage in fishing for specific species listed therein. It is undisputed that the United States Certificate of Documentation and Federal Fisheries Permits are mandatory requirements for employment of the vessel by its owner in the commercial fisheries of the United States. The defendant, at all times material to this complaint, was the owner and operator of a documented commercial vessel engaged in the fisheries and thus engaged in interstate commerce.
Defendant also alleges he is licensed as a commercial fisherman by the State of Rhode Island.
The relevant statutes provide as follows:
 46-22-3. Operation of unnumbered motorboats prohibited.
 — Every motorboat on the waters of this state shall be numbered. No person shall operate or give permission for the operation of any motorboat on those waters unless the motorboat is numbered in accordance with this chapter, or in accordance with applicable federal law, or in accordance with a federally approved numbering system of another state, and unless:
 (1) The certificate of number awarded to the motorboat is in full force and effect, and
 (2) The identifying number set forth in the certificate of number is displayed on each side of the bow of the motorboat.
 46-22-4. Identification number and registration fee. — (a)(1) Except as otherwise provided in subsection (b), the owner of each motorboat shall file annually an application for registration with the department of environmental management on forms approved by the director. The application shall be accompanied by a registration fee according to the following schedule:

 OVERALL LENGTH ANNUAL FEE
 AT LEAST NOT MORE THAN
 FEET FEET
 UNDER 16 $15
 17 20 $20
 21 25 $30
 26 30 $50
 31 35 $100
 36 40 $125
 41 45 $150
 46 50 $200
 51 and over $300

 * * *
 (b) The owner of any motorboat already covered by an identification number, in full force and effect, which has been awarded to it pursuant to then operative federal law or a federally approved numbering system of another state, shall record the number with the department of environmental management prior to operating the motorboat on the waters of this state in excess of the ninety (90) day reciprocity period provided for in § 46-22-6(a). The recordation shall be in the manner and subject to the procedure and fees required for the award and transfer of a number under subsections (a) and (c) through (i) of this section, except that no additional or substitute number shall be issued.
 46-22-6. Exemption from numbering provisions of this chapter. — A motorboat shall not be required to be numbered under this chapter, if it is:
 (a) Already covered by a number in full force and effect which has been awarded to it pursuant to federal law or federally approved numbering system of another state; provided, however, in the event the boat is to be operated on the waters of this state in excess of ninety (90) days, the owner shall record the number with the department of environmental management, division of boating safety, and pay the fees required under this chapter.
 (b) A motorboat from a country other than the United States temporarily using the waters of this state.
 (c) A motorboat whose owner is the United States, a state, or a subdivision thereof.
 46-22-19. Penalties. — In addition to any other penalties specified in this chapter:
 (a) Any person who violates any provision of §§ 46-22-3 — 46-22-5, 46-22-8, 46-22-9.2, 46-22-10, and 46-22-13, or who violates any rule or regulation made under the provisions of this chapter shall be guilty of a misdemeanor and shall be subject to a fine not to exceed one hundred dollars ($100) for each violation.
Defendant correctly asserts that the federal government has developed a comprehensive scheme governing the documentation (numbering and registration) and licensing of motorized commercial vessels which function as instrumentalities of interstate commerce. See 46 U.S.C. § 12101 46 U.S.C. et seq.,
12301, et seq.; 46 CFR 67.01 et seq. and 33 CFR 173. Further defendant seeks to distinguish federally documented commercial vessels engaged in interstate commerce from documented recreational vessels which are not required to be documented and for which there is no Commerce Clause implication.
The State acknowledges the predominant federal influence in the area and concedes there is federal preemption of documentation but insists the State can nevertheless require the additional registration of documented vessels. The State argues that since it does not require the vessel to be numbered, it can require the vessel to be registered. The State succinctly states:
. . . federally documented vessels must bear federally issued numbers and no state can number such a vessel. By the same token, vessels which are not so documented must bear a state number and the federal government must refrain from issuing a number to such a vessel.
Thus the State maintains that while it may not lawfully issue the "All Maine Woman" an identification number it can require the owner to register the vessel in the same manner as undocumented vessels and subject it to the same annual registration fee. The State suggests that this fee is not a tax, that it is reasonable when compared to the value of the vessel, and that it is based on the overall length of the vessel. Further, the State points to the distribution of the funds collected as found in § 44-27-18 in support of its position. Under that section a portion of the revenue collected is devoted to defray the costs of operating the Division of Boating Safety within the Department of Environmental Management; to promoting boating safety and safety programs, to maintenance and improvement of recreational and navigational facilities, including aids to navigation. Significantly, the remaining portion of the revenue collected from in-state residents is forwarded to the state's municipalities in lieu of the imposition of property taxes on motorboats. Defendant is a resident of Rhode Island.
Finally, the State maintains that § 46-22-4 is a valid exercise of the state's police power and suggests that Rhode Island's authority to require registration and the payment of an annual fee based upon vessel length for vessels which are required to be federally documented falls within its traditional police power. As authority for this position, the State relies onJones v. Roth Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604, (1977) in which the Supreme Court acknowledged the historic tension between the sovereignty of the states and the government of the United States and reiterated its position that any inquiry must "start with the assumption that the historic police powers of the state [are] not to be superceded unless that was the clear and manifest intent of Congress." Jones v. Roth Packing Co., 97 S.Ct. 1305 at 1309, quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).
Defendant correctly asserts that Roth Packing Co., supra,
merely sets the standard to apply when passing upon statutes enacted pursuant to a state's exercise of its traditional police powers and does not answer the question of whether or not this regulation falls within Rhode Island's police power. Defendant maintains the State has limited authority in the area of vessel registration and regulation and only to the extent that authority has been delegated by Congress. Defendant points to the legislative history of Chapter 22 of Title 46 as persuasive authority that the State of Rhode Island did not enter the area of regulation of boats until 1959, with the enactment of P.L. 1959 C. 187, presently found at 46-22-1 et seq. and only after the enactment by Congress of the Motorboat Act of 1940 and its successor, the Federal Boating Program of 1958. Defendant maintains this delegated authority was strictly limited to undocumented vessels.
Defendant further maintains that 46 U.S.C. § 12501 etseq. entitled "VESSEL IDENTIFICATION SYSTEM" demonstrates that federal documentation of vessels and state registration of undocumented vessels are mutually exclusive. Defendant alleges that Rhode Island is without authority to require a vessel which must be federally documented to also be registered and therefore licensed in Rhode Island.
PREEMPTION
The regulation of shipping and of vessels engaged in trade has been within the domain of Congress since the ratification of the Constitution.
 The basic form for the comprehensive federal regulation of trading and fishing vessels was established in the earliest days of the Nation and has changed little since . . . Vessels engaged in domestic or coastwise trade or used for fishing are `enrolled' under procedures established by the Enrollment and Licensing Act of February 18, 1793, 1 Stat. 305 codified in 46 U.S.C.C. 12. `The purpose of an enrollment is to evidence the national character of a vessel . . . and to enable such vessel to procure a license.' Douglas v. Seacoast Products, Inc., 97 S.Ct. 1740, 1745-46 (1977) quoting The Mowhawk, 3 Wall. 566, 571, 18 L.Ed. 67 (1866); Anderson v. Pacific Coast S.S. Co., 225 U.S. 187, 199, 32 S.Ct. 626, 630, 56 L.Ed. 1047 (1912).
The license regulates the use to which the vessel may be put and is designed to prevent fraud against the revenue of the United States by limiting the vessel's use to that for which it is licensed. Douglas v. Seacoast Products, Inc., 97 S.Ct. 1740, 1746. A properly enrolled and licensed vessel is deemed to be "a vessel of the United States entitled to the privileges of vessels employed in the coasting trade or fisheries." 46 U.S.C. § 251,Douglas v. Seacoast Products, Inc., supra, at 1746.
Any inquiry into the power of the states to regulate and tax vessels of the United States engaged in coastwise trade or the fisheries must begin with the seminal case of Gibbons v. Ogden,
9 Wheat. 1, 6 L.Ed. 23 (1824). In that case the State of New York, in an effort to encourage the development of steamboats, granted a monopoly to Robert Fulton and Robert Livingston, for the exclusive right to operate such vessels in the territorial waters of the State of New York. Fulton and Livingston granted Aaron Ogden the right to operate between Elizabethtown Point New Jersey and New York City. In defiance of Ogden's franchise from Fulton and Livingston, Thomas Gibbons began to compete with Ogden for ferry customers over the same route. Gibbons' steamboats were enrolled and licensed by the United States. Ogden obtained an injunction in the State Court of New York restraining Gibbons from navigating those waters. New York's highest court affirmed the issuance of the injunction and rejected Gibbons' argument that the New York statutes granting the monopoly were invalid and repugnant to the U.S. Constitution. Gibbons appealed to the Supreme Court of the United States. Chief Justice John Marshall, in an extraordinary and historic ruling staked out the power of Congress under the Commerce Clause and the Supremacy Clause. The Marshall Court held that Congress' power to regulate commerce among the states extends to the territorial waters of a state and that the states have no concurrent power to regulate commerce between the states.
The Court then declared that the license and enrollment held by Gibbons was to carry on the coasting trade for one year and that the legislative monopoly and laws adopted by New York were in conflict with that license and were invalid. 6 L.Ed. at 73.
In Sinnot v. Davenport, 63 U.S. 227 (1859), the Supreme Court was confronted with a law enacted by the State of Alabama requiring the owners of steamboats navigating within the state's territorial waters to register themselves and the vessel with the probate court prior to leaving the port of Mobile, Alabama. Alabama attempted to apply the law to vessels which were licensed and enrolled by Congress. The Court struck down the state law as unconstitutional and in conflict with the federal enrollment and license of the vessel. In Sinnot, the Court relied upon its prior decision in Gibbons v. Odgen, supra, and held that Alabama cannot require an additional registration requirement on a vessel which enjoys the privileges afforded by the enrollment and license of the vessel. Alabama could not lawfully require this registration as a condition of entering or leaving its ports. "Certainly, if this state law can be upheld, the full enjoyment of the right to carry on the coasting trade as heretofore adjudged by this Court under the enrollment and license is denied to the vessel in question. Sinnot v.Davenport, 63 U.S. at 242.
The Court further held that since Congress required the owner of the vessel to register and furnish the same information, "Congress therefore has legislated on the very subject which the State act has undertaken to regulate" . . . and the State is precluded from doing so. Id. The Court specifically rejected Alabama's argument that the law was an exercise of its police power and held that Alabama's sovereignty must, under the Supremacy Clause, yield to the laws of Congress enacted pursuant to a clear power under the Constitution. Sinnot v. Davenport,
63 U.S. at 242-43. The Court held that where a state purports to act under the power reserved to the states in the Constitution, often described as the police power, the Supremacy Clause should be applied only in cases where there is a direct and unresolvable conflict between the acts of Congress and those of a state and where Congress acted under a power expressly reserved to it by the Constitution. The Court found that the Act of Alabama raised that precise question.
 "The whole commercial marine of the country is placed by the Constitution under the regulation of Congress, and all laws passed by that body in the regulation of navigation and trade, whether foreign or coastwise, is therefor but the exercise of an undisputed power. When, therefore, an Act of the Legislature of a State prescribes a regulation of the subject repugnant to and inconsistent with the regulations of Congress, the state law must give way; and this, without regard to the source of the power whence the State Legislature derived its enactment.
 This paramount authority of the act of Congress is not only conferred by the Constitution itself, but is the logical result of the power over the subject conferred upon that body by the States. They surrendered this power to the General Government; and to the fair exercise of it by Congress, the Act must be supreme." Sinnot et al. v. Davenport et al., 63 U.S. 227, 243 (1859).
Finally, the Sinnot Court reiterated its prior rulings that the states have not completely surrendered their power to legislate in a given area but only to the extent the power is reserved to Congress in the Constitution. The Court correctly predicted that balancing the power of Congress under the Commerce Clause against the police power of the states would keep the bench and bar involved in the resolution of numerous disputes over the years.
In Harman v. City of Chicago, 147 U.S. 396, 13 S.Ct. 306 (1893), the Court struck down an ordinance of the City of Chicago requiring the owners and operators of steam tug boats to obtain licenses for the privilege of navigating the Chicago river. The Court found that the tugs in question were enrolled and licensed in the coasting trade of the United States, that the license conferred the right to navigate the tugs on the rivers and waters of the United States and that the ordinance in question prohibits the owners from exercising their rights under the federal enrollment and license. The Court found the ordinance restrained the use of the vessels in commerce, was a burden upon interstate commerce over which Congress has control. The Court based that part of its ruling on Gibbons v. Ogden, supra, and likened the case to Sinnot v. Davenport, supra.
 The requirement that every steam tug, barge, or towboat towing vessels or craft, for hire, in the Chicago river or its branches, shall have a license from the city of Chicago, is equivalent to declaring that such vessels shall not enjoy the privileges conferred by the United States except upon the conditions imposed by the city. This ordinance is, therefore, plainly and palpably in conflict with the exclusive power of congress to regulate commerce, interstate and foreign.
13 S.Ct. at 310.
The Court then proceeded to declare the imposition of the fee to obtain the license to be a tonnage tax which violated the Constitution's prohibition against the imposition on taxes for tonnage.
In Smith v. Maryland, 18 Hrv. 71, 15 L.Ed. 269 (1855) the Court ruled that the states could constitutionally regulate the taking of oysters from state waters and could impose those regulations upon enrolled and licensed vessels. The Smith Court held the question is whether or not the state had the power to enact the law. "This question must be decided, in each case, upon its own facts . . . but a state may make valid laws for the seizure of vessels of the United States. Such among others, are quarantine and health laws." 15 L.Ed. at 271.
Thus the principle that states may regulate the activities
of documented vessels within the ambit of their traditional police powers has developed throughout the history of the nation. In Manchester v. Massachusetts, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159 (1891) the regulation prohibiting certain types of fishing tackle was held to apply to vessels of the United States. The Court examined the regulation and found it was nondiscriminatory against citizens of other states, was reasonable and the Court found there to be no concomitant federal enactment. The defendant suggests that both Smith v. Maryland
and Manchester v. Massachusetts would be affected today by the subsequent enactment by Congress of the Magnusson Fisheries Conservation Act and the present predominance of federal law in the regulation and conservation of the fisheries. Cf. State v.Sterling, 448 A.2d 785 (R.I. 1982), in which the Rhode Island Supreme Court upheld the dismissal of a criminal complaint on preemption grounds which charged the defendant with violations of state regulations regarding the landing and possession of yellow tail flounder in Rhode Island's waters, regardless of where the fish were captured.
In Sterling, supra, the Court found that Rhode Island had a sufficient interest in preventing the depletion of yellow tail flounder to justify extraterritorial enforcement of its regulations. However the Court found that the Fishing Conservation Management Act of 1976, 16 USCA § 1801 et seq.
specifically precludes the states from regulating fishing outside its territorial waters Id. § 1856. Thus the Court found that Congress has preempted state regulation of commercial fishing.Id.
In the case at bar, the State maintains that unlikeSterling, there is no explicit prohibition against requiring documented commercial vessels to obtain dual licensing and registration and subjecting those vessels to dual charges and fees.
Defendant alleges that by the very dominance of Congress in the area of commercial trade and fisheries and the breadth and detail of federal involvement in the field, Congress has explicitly and impliedly expressed its intent to preempt the states from regulating in the area of documented commercial fishing vessels.
Federal preemption of a state statute or regulation usually arises in one of three ways: The federal statute explicitly prohibits all state regulation in the field, Jones v. RothPacking Co., supra; the extent of the federal regulation in the area is so extensive and pervasive "as to generate the reasonable inference that Congress intended to leave no domain open to state regulatory supplementation, Tart v. Commonwealthof Massachusetts, 949 F.2d 490 (1st Cir. 1991); or the federal and state statutes are in such conflict that it is impossible to fully comply with both enactments or that enforcement of the state statute frustrates Congress' intent in enacting the federal statute Id. quoting Pacific Gas Electric Co. v. State EnergyResources Conservation Dev. Comm'n, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722 75 L.Ed.2d 752 (1983).
Neither side can point the Court to any explicit prohibition against state regulation in the field of documented federal vessels. Defendant maintains that the history of the nation and the enactments of Congress since the enactment of the Enrollment and Licensing Act of February 18, 1793, 1 Stat 305, indicates an express intent by Congress to dominate the field. The Court agrees.
State regulatory authority over undocumented motorboats stems from a delegation of that authority by the Congress and not from any inherent police power. Title 46 of the United States Code § 12301 et seq., contains an express but limited grant of power to the states over undocumented vessels. Section 12302 provides that any numbering system adopted by a state must be approved by the Secretary of Transportation which can be withdrawn by the Secretary if the numbering system is changed or not conducted to federal standards. This limited authority over undocumented vessels is the only area of maritime law specifically delegated to the states. Congress has historically and exclusively regulated all matters pertaining to documented vessels. Indeed, Congress has acted so consistently and pervasively in this area as evidenced by an examination of Title 46 of the United States Code, the Court must conclude Congress intended to leave no room for state regulation. The fact that Congress reserved its supervisory authority over any state numbering of undocumented vessels leads to the inescapable conclusion that Congress intends to and in fact does dominate and control the use of the nation's waterways and seas.
The legislative history of Chapter 22 of Title 46 of the General Laws provides further support for this conclusion. Chapter 22 was enacted by P.L. 1959 Ch. 187 and approved on May 27, 1959, after the passage of the Federal Boating Program of 1958, 48 USCS § 527. The term "motorboat" was defined as follows:
 (b) `Motorboat' means any vessel propelled by machinery, whether or not such machinery is the principal source of propulsion, but shall not include a vessel which has a valid marine document issued by the bureau of customs of the United States Government or any federal agency successor thereto. § 46-22-2(b) (Emphasis Supplied)
Thus from its inception, the state statute requiring registration of vessels in Rhode Island waters specifically excluded documented vessels. It was not until 1990, in P.L. 1990 Ch. 65, the state budget article, did the General Assembly change the definition of "motorboat" and no longer exempted documented vessels from state registration. The 1990 Act also substantially increased the annual registration fees payable to the state as part of its 1990 state budget.
This sweeping legislative mandate is justified by the State as an exercise of its inherent police power. The State cannot distinguish this statute from the Act of the State of Alabama struck down in Sinnot v. Davenport, supra. The State of Rhode Island is not, by § 46-22-4 regulating any activity of the vessel, Smith v. Maryland, supra, nor is it concerned with the vessel's safety equipment or boilers, Huron Portland CementCo. v. City of Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed. 2nd 852 (1960). Likewise the state is not regulating the landing of fish, Tart v. Commonwealth of Massachusetts, supra or the assignment of mooring space and the location of moorings within the state's harbors, Barber v. Hawaii, 42 F.2d 1185 (9th Cir. 1994). It is inescapable that the State seeks to require the licensing and registration of vessels prior to entering upon and remaining in its waters in excess of 90 days. This it cannot do.
The Court finds the registration and licensing of documented vessels engaged in the fisheries and coasting trade to be implicitly reserved to the Congress. The Court finds that since its very inception, the Congress of the United States has clearly and manifestly demonstrated an intent to preempt the area of documented commercial vessels, leaving no room for state action in the field.
Moreover, the Court finds the state statute to be in direct conflict with the regulations of Congress and to clearly frustrate the congressional purpose underlying the federal statutes. Tart v. Commonwealth of Massachusetts, supra.
Federal licensing and documentation of a vessel entitles the vessel to navigate and remain in state territorial waters for the purpose for which the vessel is licensed, i.e. fishing. The movement of vessels from state to state and back again is an activity included in the federal license and documentation. The State of Rhode Island, seeks to prevent vessels from operating in Rhode Island waters without registering the vessel with the state and paying a substantial annual fee. Thus, the State seeks to employ its penal laws to prevent and frustrate that which Congress has ordained. A vessel's anticipated presence upon the waters of the state for more than 90 days triggers the requirement of registration and the payment of a licensing fee. The Court can only conclude that this statute clearly frustrates the intent of Congress and cannot stand. The Court declares the statute to be unconstitutional as violative of the Commerce Clause of the U.S. Constitution and to be a nullity.
Neither party seeks to distinguish § 46-22-4(b) from other invalid licensing requirements on the ground the statute is not triggered unless the owner anticipates operating on the waters of this state in excess of 90 days. The Court has not overlooked this aspect of the enactment and finds it does not save its constitutionality. Motorboats by their very nature travel the waterways of the nation. Vessels engaged in the coasting trade or fisheries are expected to enter into and leave the territorial waters of a state or states. Fish, by their very nature migrate according to the species and this factor dictates where a vessel in search of fish may roam. Clearly, Congress was aware of these obvious features when it chose to dominate the field of enrollment and licensing of fishing vessels. Thus, the Court finds the so-called 90 day "reciprocity period" or grace period to have no effect on its holding with respect to preemption. The Court notes that the registration and fee requirements of §46-22-4(b) obtain prior to the start of the ninety day period.
TONNAGE TAX
Defendant maintains the state statute impermissibly imposes a tonnage tax on the vessel in violation of the U.S. Constitution, Art. 1 § 10, cl. 3 which provides. "No state shall, without the consent of Congress, lay any duty of tonnage . . ."
Defendant correctly asserts that § 46-22-4 is not a flat fee imposed upon all vessels but is assessed according to a schedule where the fee increases according to the size of the vessel. This fee is for registration of the vessel and its license to operate in state waters in excess of 90 days. While it is not declared to be a property tax, a portion of the revenue collected is distributed annually to the cities and towns. This revenue is declared to be in lieu of property taxes for motorboats which are specifically exempt from property taxation. G.L. 1956 (1988 Reenactment) § 44-3-3(27). Thus, this enactment allows Rhode Island to impose a fee on vessels engaged in interstate commerce and distribute revenue to its municipalities in lieu of property taxes. It is axiomatic that Rhode Island is precluded from imposing a property tax on the "All Maine Woman" in the first instance.
The State suggests this fee is not imposed on the privilege of entering or remaining in Rhode Island waters but likens it to a use tax or an excise tax; Magic II, Inc. v. Dubno, 206 Conn. 256,537 A.2d 998 (1988). This reliance is misplaced. A use tax or sales tax is a one-time payment due and owing upon the purchase of a vessel from a retailer; General Statutes of Conn. Sec. 12-411; Magic II, Inc. v. Dubno, supra n. 1 at 998. See:State v. Zack, 502 A.2d 896 (Conn. 1985); State v. Bondi,531 A.2d 151 (Conn. App. 1987).
Duties of tonnage or tonnage taxes have historically been defined as fees and charges levied upon the privilege of entering or remaining in a port or the territorial waters of a state.Clyde Mallory Lines v. State of Alabama, 296 U.S. 261, 56 S.Ct. 194 (1935). These charges are separate and distinct from fees for services rendered to the vessel such as pilotage, wharfage, storage and charges for loading and unloading the vessel.
 Hence the prohibition against tonnage duties has been deemed to embrace all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel which operate to impose a charge for the privilege of entering, trading in, or lying in a port. Id.
These fees have been routinely declared invalid as a duty of tonnage in violation of the U.S. Constitution or as an impermissible burden on interstate commerce. Moran v. NewOrleans, 112 U.S. 69, 28 L.Ed 653 (1892); Steamship Co. v.Portwardens, 6 Wall. 31, 18 L.Ed 749 (1867); State TonnageTax Cases, 79 U.S. 204, (1870). Where the Court has found that the fee imposed is not for a specific service provided by the state seeking to collect the tax, the Court has not hesitated to declare it a duty on tonnage even where it does not relate to the tonnage of the vessel. Steamship Co. v. Portwardens, supra;Harman v. City of Chicago, supra; State Tonnage Tax Cases,supra.
Historically, the Court has scrupulously examined the enactments alleged to impose a tonnage tax and has consistently found that interstate commerce can be required to pay its way. (Citations omitted). Likewise, the Court has always recognized the right of the states to levy taxes "upon ships and vessels owned by the citizens of the state as property, based on avaluation of the same as property . . ." State Tonnage TaxCases, 79 U.S. at 213 (Emphasis supplied).
Where services are alleged to be provided to justify the imposition of the fee, the Court has examined the enactmentSteamship Co. v. Portwardens, supra, and looked for actual services as opposed to the functions of government as a wholeId.; Harman v. City of Chicago, 147 U.S. 396, 13 S.Ct. 306 (1893).
In Clyde Mallory Lines v. State of Alabama, supra, the Court upheld the imposition of a reasonable harbor fee of $7.50 for all vessels "500 tons and over." 56 S.Ct. at 195. The Supreme Court of Alabama found the fee was a charge for policing the harbor under rules adopted by the state including fire protection. The Supreme Court agreed and declared that a reasonable charge for a general service to all who use the harbor was not "within the historic meaning of the phrase `duty of tonnage' nor the purpose of the constitutional prohibition." 56 S.Ct. at 197. The Court further held the fee used to defray the cost of a "purely local regulation of harbor traffic" is not an objectionable burden on commerce. Id.
Where, as here, the fee does not relate to services that are essential to navigation by water and is based upon entry or presence in a harbor or other territorial waters, it is impermissible and can not stand. Parkersburg Ohio RiverTransp. Co. v. City of Parkersburg, 107 U.S. 691, 2 S.Ct. 732 (1883).
The State does not offer any such construction upon the statute to save its constitutionality. Indeed, the state likens the payment of an annual registration fee to that of a one-time use or sales tax. This comparison is without merit and ignores the fact that the "All Maine Woman" is home ported in Massachusetts. Further, the distribution of funds collected by this fee pursuant to § 46-22-18 anticipates that a portion of the revenue collected from in-state residents is to be distributed to the cities and towns in lieu of property taxes. The Court notes the defendant is a resident of Rhode Island.
The Court therefore finds the imposition of a fee upon the vessel simply due to its presence in Rhode Island waters for more than 90 days to be a tonnage tax and an impermissible burden upon interstate commerce.
The Court further declares that portion of § 46-22-4(b) which requires federally documented vessels engaged in interstate commerce to register with the State of Rhode Island § 46-22-4(b) to be unconstitutional, and null and void.
This matter is dismissed. Counsel shall prepare an order consistent with this decision.