GREAT LAKES DREDGE & DOCK CO. et al. v. CHARLET, Administrator, Division of Employment Security, Louisiana Department of Labor.

No. 435.

District Court, E. D. Louisiana, New Orleans Division.

March 17, 1942.

982

·Deutsch and Kerrigan and Eberhard P. Deutsch, all of New Orleans, La., and Ryan, Condon & Livingston, of Chicago, Ill., for plaintiffs.

W. C. Perrault, Asst. Atty. Gen., and Aubrey B. Hirsch, Gen. Counsel, Division of Employment Security, etc., of Baton Rouge, La., for defendant.

CAILLOUET, District Judge.

The eight plaintiffs herein are all engaged in the dredging business.

They seek a declaratory judgment against the Administrator of the Division of Employment Security of the Department of Labor of the State of Louisiana who is officially charged with the enforcement and administration of the Louisiana Unemployment Compensation Law, or Act No. 97 of 1936, which has been amended by Act No. 164 of 1938, Act No. 16 of the First Extra Session of 1940 and Act Nos. 10 and 11 of 1940.

As Section 18 of the statute originally read, there was excepted (Sec. 18 (g) (7) from the term "employment", as defined therein, any service "performed as an officer or member of the crew of a vessel on the navigable waters of the United States."

Under the amendment by Act. No. 164 of 1938, this verbiage was changed into that which subsists until the present, so that the particular service excepted under Section 18(g) (6) (C) is that "performed as an officer or member of the crew of a vessel on the navigable waters of the United States *customarily operating between ports in this State and ports outside this State*" (Italics supplied).

The plaintiffs contend that insofar as this provision operates an inclusion, within the "employment" defined by the statute, of the crew officers and members of vessels owned and operated by them within the State of Louisiana, Section 18 is null, void and of no effect as violative of Section 2 of Article 3 and Section 8 of Article 1 of the Constitution of the United States; which constitutional provisions, plaintiffs aver, vest Congress with the exclusive power to legislate concerning matters within the admiralty and maritime jurisdiction of the United States and deprive the States of all power to legislate relative thereto; and plaintiffs pray that there be rendered a declaratory judgment so decreeing the claimed unconstitutionality.

A motion to dismiss the action for the alleged reason that the complaint fails to state a claim upon which relief can be granted because it does not set out a valid cause or right of action was first filed and was followed by the defendant's answer, but with full reservation of all rights under said motion to dismiss.

The defendant asserts his intention to officially enforce each and every provision of the law under attack and avers that an agreed statement of facts is on file in the record, wherefrom one may determine the character of the operations carried on by the plaintiffs, etc.

The matter was submitted to the Court upon such stipulation, which includes the following pertinent statements of fact, to-wit:

"I. The employees referred to in plaintiffs' complaint are employed in the navigation and operation of floating hydraulic, clam shell, dipper and hopper dredges, pile drivers, quarter boats, tugs, launches, barges, and other and appurtenant vessels, used for deepening, widening, improving, extending and cleaning navigable channels and other navigable waters in this State, and for creating fill and other similar operations. * * *

"IV. Dredges which are not self-propelled are towed from place to place. Many such voyages extend from one state and country to another, frequently over the high seas. In voyages from one scene of operation to another, just as during operations, the dredge and each of the other vessels involved in this cause transports her crew, machinery, equipment, fuel and supplies. On such voyages, the dredge is under command of her master and is manned by her regular officers and crew, just as when dredging. * * *

"IX. A dredge customarily has an auxiliary fleet consisting of two or more tugs, two or more motorboats, fuel barges, equipment barges, a derrick barge, a dragline barge, numerous skiffs and many pontoons. The tugs are used to tow the dredge, barges and pontoons, and the motorboats are used to transport the officers and crew between ship and shore and to carry supplies to the dredge. As their names indicate, the fuel barges are used for transporting and storing fuel, and the equipment barges are used to transport pipe and other equipment needed in the dredging operations. The derrick and dragline barges are used to transport derricks and draglines, and to move and handle pipe, anchors and other heavy equipment. * * *

"XII. All the dredges and other vessels involved in this litigation are enrolled as vessels of the United States and licensed by the Bureau of Marine Inspection and Navigation of the Department of Commerce to engage in the coasting trade.

"XIII. The personnel of the dredge consists of the following complement of officers and crew: The master, commonly referred to as captain; first officer, generally called deck captain; purser, sometimes called paymaster; four mates; twelve or more deck hands; a chief engineer; three assistant engineers; fourth assistant engineer, sometimes called handyman; three or more engine room oilers; one to three deck oilers; three or more firemen; four levermen; a machinist and one or more helpers; a welder and one or more helpers; a ship's carpenter and helper; an electrician and helper; a chief steward, two or more cooks; three or more mess-boys; one or more cabin boys and one or more motorboat operators; four or more tug captains; and four or more tug mates or engineers; shore foreman and crew.

"XIV. The duties of the officers and members of the crew of the dredges are as follows:

"(a) The master is in complete charge of the dredge and issues all orders relative to her navigation and dredging operations. He is responsible for the safety of the personnel and for the safety of the dredge.

"(b) The first officer, or deck captain, sees to it that the captain's orders are carried out. He conveys these orders to the levermen who navigate and operate the dredge, to the mates in charge of the deck hands and to the engineer in charge of the engine room.

"(c) The purser handles the usual duties of the ship's purser. He is the fiscal officer managing all finances, keeping time records, payrolls and operations logs.

"(d) The chief engineer is responsible for the proper functioning of all machinery on board. An assistant engineer is on duty on each of the watches and supervises the work of the oilers in the engine room and the firemen in the boiler room.

"(e) The mates are in charge of the various watches on deck. They supervise the work of the deck hands, which consists of the customary deck hand duties, such as scrubbing, chipping, painting, manipulating lines and pontoons, manning life boats, dropping and weighing anchors, and assisting generally in the operation and navigation of the dredge and the other craft involved in this litigation.

"(f) The ship's carpenter, machinist, welder, electrician, and their helpers, perform the duties which their designations indicate.

"(g) The steward is responsible for the food served, planning of the meals, the supplying and condition of the galley and mess hall. Four regular meals are provided daily for the officers and crew aboard the dredge, and coffee and light food are available at all hours. The cooks prepare the meals assisted by the mess boys, who also act as waiters. The cabin boys, who attend to the quarters of the men, are also under the supervision of the steward.

"(h) The tug captains are in charge of the tugs and supervise the work of their deck hands and engineers, and deck hands on the other craft, in assisting the dredge to maneuver, in towing fuel and water barges to and from sources of supply, in moving other equipment, barges, and sections of floating pipe and pontoons.

"(i) The motorboat operators maneuver and are in charge of the motorboats which transport the vessel's personnel and some minor supplies between ship and shore. The tugs are also sometimes used for these purposes.

"(j) When a hydraulic dredge does not deposit the dredged material at another location in the water in which it is operating, it deposits such material on shore or on an island known as a spoil bank. In such cases, the pipe line runs from the dredge over the water to and along the spoil bank being supported over the water by pontoons. The operation and handling of the pipe line on shore is in charge of a foreman and five assistants, who have ten or more employees under their supervision. Their duties are to locate and lay the pipe line over the land and keep it in working order; to extend the pipe line as occasion requires to distribute the dredged material flowing from its end; and to dismantle the pipe line and assemble its constituent parts. The shore crew may not ordinarily live aboard ship, but they are frequently maintained aboard quarter boats. If more than a day or two are required for the dredge to go from one place of operations to another, the shore crew is usually discharged when operations are discontinued at the first place, and re-employed when operations are commenced at the second place. * * *.

"XVI. Many of the officers aboard the dredges, while not always under strict requirements in that regard, hold federal licenses. By training and experience, and the nature of the work and services rendered, the officers and crew of a dredge are required to meet the same physical, mental and disciplinary standards, and to perform functions similar to those required of any other seamen. They are afforded the facilities of U. S. Marine Hospitals, the same as any other seamen.

"XVII. The vessels involved in this litigation do not customarily operate between ports in this state and ports outside of this state.

"XVIII. All of said employees are paid wages of varying amounts."

It is conceded by the plaintiffs that the Louisiana Unemployment Compensation Statute is broad enough in its terms to cover the employment of all of their respective employees, but they seek to avoid the effect of such coverage by contending that the Legislature's enactment of the stat-

ute, so as to make the law applicable to the particular employments at issue, constituted an invasion of a field of legislation reserved exclusively to Congress by the Federal Constitution.

On the other hand, the defendant's position is, in effect, that the Louisiana statute does no more than levy a non-discriminatory excise tax based upon the exercise of the privilege of employing individuals measured by the wages paid; the right to impose which undoubtedly existed prior to the adoption of the Constitution and was never surrendered by the several states. Defendant further urges, substantially, that said Louisiana Unemployment Compensation Law in no manner changes, modifies or affects the rights, duties or obligations of parties to maritime contracts, nor contravenes the essential purpose of any act of Congress, or works material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony or uniformity of that law in its international and interstate relations.

For the present purposes it may be assumed, though it is not decided, that all of the employments at issue are maritime in character and within admiralty jurisdiction.

Plaintiffs, in support of their contention that the Louisiana Unemployment Compensation Act (insofar as its provisions cover such employment) is violative of the Constitution of the United States, place great reliance upon the workmen's compensation cases, wherein the United States Supreme Court held that state compensation statutes may not be applied to seamen in the face of the settled doctrine that Congress is vested with paramount power to fix and determine the maritime law which shall prevail throughout its nation; and that no state legislation is valid which "works material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law". Southern Pacific Company v. Jensen, 1917, 244 U.S. 205, 37 S.Ct. 524, 529, 61 L.Ed. 1086, L.R.A.1918C, 451, Ann.Cas.1917E, 900; Knickerbocker Ice Co. v. Stewart, 1920, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834, 11 A.L.R. 1145; Washington v. W. C. Dawson & Co., 1924, 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646.

In the Southern Pacific v. Jensen case, the Supreme Court said of the remedy attempted to be provided (against their employers) to injured employees engaged in longshoremen's work, under the New York State Workmen's Compensation Law, Consol.Laws, c. 67, that it was a remedy of such character as was wholly unknown to the common law, incapable of being enforced by the *ordinary* processes of *any* Court, and not saved to suitors from the grant of exclusive jurisdiction of all civil cases of admiralty and maritime jurisdiction vested in the Federal district courts. 28 U.S.C.A. § 41(3).

The Knickerbocker Ice Co. v. Stewart case involved the attempt of Congress to alter the grant to United States District Courts of exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, by adding to the saving clause, i. e., "saving to suitors, in all cases the right of a common-law remedy where the common law is competent to give it", 28 U.S.C.A. § 41(3), the following words, viz: "and to claimants * * * their rights and remedies under the workmen's compensation law of any State."

After a review of the Southern Pacific Company v. Jensen case and others, said the Supreme Court (40 S.Ct. at page 440): "As the plain result of these recent opinions and the earlier cases upon which they are based, we accept the following doctrine: The Constitution itself adopted and established, as part of the laws of the United States, approved rules of the general maritime law and empowered Congress to legislate in respect of them and other matters within the admiralty and maritime jurisdiction. Moreover, it took from the states all power, by legislation or judicial decision, to contravene the essential purposes of, or to work material injury to, characteristic features of such law or to interfere with its proper harmony and uniformity in its international and interstate relations. To preserve adequate harmony and appropriate uniform rules relating to maritime matters and bring them within control of the federal government was the fundamental purpose; and to such definite end Congress was empowered to legislate within that sphere."

Observing that Congress, by so amending the saving clause aforementioned, had evidently sought to permit application of state compensation laws to injuries sustained by employees within admiralty and maritime jurisdiction, and to circumvent the objection to such an application, which had been pointed out by the Southern Pacific Co. v. Jensen case, the Supreme Court held

that Congress could not delegate its power of legislation on the subject to the several states.

In Washington v. W. C. Dawson & Co., supra, the immediate question presented was whether the defendant stevedoring business, in the operation of which its employees worked only upon ships in navigable waters, could be compelled to contribute to the accident fund established by the Industrial Insurance Act of the State of Washington, which provided for workmen's compensation.

The state statute, under its terms, was made applicable to employers and workmen engaged in maritime work or occupation *only* to the extent that the payroll of such workmen was clearly separable from the payroll covering workmen employed under circumstances in which liability did or might exist in the United States courts of admiralty; and the State Supreme Court (122 Wash. 572, 582, 211 P. 724, 726, 212 P. 1059, 31 A.L.R. 512) held, under authority of Southern Pacific Co. v. Jensen and Knickerbocker Ice Co. v. Stewart, supra, that the Industrial Insurance Department had no right to collect a percentage of the defendant's payroll, since the bringing of such employer within the provisions of the Act "would work material prejudice to the characteristic features of the general maritime law, or interfere with the proper harmony and uniformity of that law in its international and interstate relations."

It was contended by the State in the United States Supreme Court (as in the state court) that the objections to the requirement of such contributions in support of workmen's compensation statutes, which had been previously pointed out by the two just mentioned cases, were removed by the Act of Congress of June 10, 1922, c. 216, 42 Stat. 634. See § 41(3), 28 U.S.C.A.

However, the state decision under review was affirmed by the Court specifically on authority of its aforementioned earlier decision in Knickerbocker Ice Co. v. Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834, 11 A.L.R. 1145.

Counsel for the State of Washington contended that the doctrine enunciated by the Supreme Court in Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086, L.R.A.1918C, 451, Ann.Cas.1917E, 900, and in Knickerbocker Ice Co. v. Stewart, supra, was modified by subsequent decisions of the court, i. e., Western Fuel Co. v. Garcia, 257 U.S. 233, 42 S.Ct. 89,

66 L.Ed. 210; Grant Smith-Porter Ship Co. v. Rohde, 257 U.S. 469, 42 S.Ct. 157, 66 L.Ed. 321, 25 A.L.R. 1008; and State Industrial Commission of State of New York v. Nordenholt Co., 259 U.S. 263, 42 S.Ct. 473, 66 L.Ed. 933, 25 A.L.R. 1013.

The Court, after reviewing each of said cases, held that none of them departed from the doctrine laid down in Southern Pacific Co. v. Jensen and Knickerbocker Ice Co. v. Stewart, and that the provisions of the Act of June 10, 1922, whereby there was given "to claimants for compensation for injuries to or death of persons other than the master or members of the crew of a vessel their rights and remedies under the workmen's compensation law of any State" —which rights and remedies were thereby made exclusive—could not be reconciled with such doctrine; the opinion specially calling attention to the fact that Congress, by the enactment referred to, had not exercised its undoubted power to amend, alter or revise the maritime law by legislation of general application, but had definitely manifested its intention to permit any state to alter the maritime law in such manner as best suited its own purposes,—a procedure which, necessarily, opened the door to the establishment of conflicting requirements, engendering resultant confusion and difficulties and destroying the uniformity that had been sought when the law of the sea was adopted by the Constitution as the measure of maritime rights and obligations.

These decisions, which are so relied on by plaintiffs, all emphasize the salient fact that the courts were there dealing with situations involving the attempted substitution by state legislation of different rules for the governing of the relationships existing between employers and employees under contracts of maritime employment; from the language of each statute at issue, there stood out in bold relief the definite purpose of materially altering the rights and obligations of the parties to a maritime contract.

The decreed invalidity of the Workmen's Compensation Laws involved in said Supreme Court decisions just referred to was based, in each instance, upon the Court's ascertainment of the fact that the state statute under attack actually impinged upon the essential features of the substantive maritime law; that substantial modification or complete displacement of right, obligation, liability or remedy for maintenance and enforcement thereof, was attempted by

statutory enactment, not of Congress, but of state legislature.

In no case, however, did the Supreme Court avoid a state statute which neither modified the substantive maritime law, nor dealt with the remedies enforceable in admiralty. Red Cross Line v. Atlantic Fruit' Company, 1924, 264 U.S. 109, 44 S. Ct. 274, 68 L.Ed. 582.

Plaintiffs contend that a clear and direct analogy exists between the tax to create a state workmen's compensation fund and the tax here at issue; and they reason that, because the Supreme Court held (in the cited workmen's compensation cases upon which they so rely) that permitting the operation of the state statutes *there* under examination would effect an invasion of the uniformity in respect to maritime matters which the Federal Constitution had sought to establish, it should now be decided, in effect, that the Louisiana Unemployment Compensation Act similarly "works material prejudice to the characteristic features of the general maritime law" and "interferes with the proper harmony and uniformity of the law".

Each one of the workmen's compensation statutes that were decreed illegal by the Supreme Court did materially alter the rights and obligations of employers and employees under maritime contracts; and disturbed, substantially, the desired uniformity which the Federal Constitution had sought to firmly establish. These state statutes all had for their definite purpose the prescribing of rights and liabilities of employers and employees in cases of maritime injuries, and thus did clearly invade and trench upon the exclusive field of admiralty, and the factual setup in each case wherein invalidity of state statute was so decreed, reflected the working of material prejudice to the characteristic features of the general maritime law, and *not*, by way of exception to the general rule, simply a matter of mere local concern, with reference to which the rules of maritime law might be validly modified or supplemented by state legislation.

In this connection, see: Union Fish Co. v. Erickson, 1919, 248 U.S. 308, 39 S.Ct. 112, 63 L.Ed. 261; Grant Smith-Porter Ship Co. v. Rohde, 1922, 257 U.S. 469, 42 S.Ct. 157, 66 L.Ed. 321, 25 A.L.R. 1008.

The Louisiana Unemployment Compensation Law does not, in the remotest degree, seek to directly affect the relationship inter se of the employer and employee un-

der a maritime contract. The employment agreement in its terms and operating influence, and, particularly, the rights, obligations and liabilities of the parties contractant one to the other, all remain untouched and unchanged and still wholly under the aegis of admiralty law; no subtraction, addition or substitution takes place.

■ There is no question, here, of placing "the rules and limits of maritime law under the disposal and regulation" of Louisiana and its unemployment compensation statute works no destruction of the "uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states.", as the Supreme Court held can not be permitted, in The Lottawanna (Rodd v. Heartt et al.), 21 Wall. 558, 575, 22 L.Ed. 654, at page 662.

The Louisiana Unemployment Compensation Act prescribes that each employer shall pay contributions equal to certain specified percentages of wages as are "payable by him with respect to employment". Section 6. Such contributions find their way into the state Unemployment Compensation Fund, which is administered by the Commissioner, and from said fund is paid unemployment compensation to unemployed workers in the manner and under the circumstances reflected by the statute terms.

Section 1 of the Act, as amended by Act La. No. 164 of 1938, embodies a declaration of state public policy, reading thus: "As a guide to the interpretation and application of this Act, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of this state. Unemployment is therefore a subject of general interest and concern which requires appropriate action by the Legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The Legislature, therefore,

declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this measure, for the compulsory setting aside of unemployment reserves to be used for the benefit of unemployed persons."

■ That a state may raise funds by taxation in aid of its general welfare admits of no doubt. Carmichael v. Southern Coal & Coke Co., 1937, 301 U.S. 495, 514, 57 S.Ct. 868, 875, 81 L.Ed. 1245, 109 A.L.R. 1327.

■ The contributions exacted of the employer by the Louisiana Unemployment Compensation Act are properly referred to as excise taxes. Chas. C. Steward Machine Co. v. Davis, 1937, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279, 109 A.L.R. 1293; Beeland Wholesale Co. v. Kaufman, Chairman, Alabama Unemployment Compensation Commission, etc., 1937, 234 Ala. 249, 174 So. 516; Helvering, Com'r of Internal Revenue v. Davis, 1937, 301 U.S. 619, 672, 57 S.Ct. 904, 81 L.Ed. 1307, 109 A.L.R. 1319.

However, it is immaterial whether these taxes be referred to as "excise taxes" or by other name. Carmichael v. Southern Coal & Coke Co., supra, 301 U.S. at page 509, 57 S.Ct. at page 872, 81 L.Ed. 1245, 109 A.L.R. 1327.

■ Conceding, for the purposes hereof, that *all* phases of the dredging business carried on by plaintiffs may properly be characterized as maritime and within admiralty, the State of Louisiana may nevertheless exercise—except there be constitutional prohibition against so doing—its inherent and not surrendered sovereign right of imposing excise taxes upon the exercise of the privilege of employing needed workers for the conduct and operation of such business within the borders of the State.

As relating to this, see the following cases, viz.: Gibbons v. Ogden, 1824, 9 Wheat. 1, 6 L.Ed. 23; Chas. C. Steward Machine Co. v. Davis, supra, 301 U.S. at page 579, 57 S.Ct. at page 880, 81 L.Ed. 1279, 109 A.L.R. 1293; Carmichael v. Southern Coal & Coke Co., supra, 301 U.S. at pages 508, 509, 57 S.Ct. at page 872, 81 L.Ed. 1245, 109 A.L.R. 1327.

Reference is also made to: Lawrence et al. v. State Tax Commission of Mississippi, 1932, 286 U.S. 276, 52 S.Ct. 556, 76 L.Ed. 1102, 87 A.L.R. 374.

■ The constitutional grant of admiralty and maritime jurisdiction to the Federal Government (Art. 3, § 2, and Art. 1, § 8) is in no wise trenched upon, or detracted from, by the attempted levying and collection by a state of an excise tax upon the act of employing an "officer or member of the crew of a vessel on the navigable waters of the United States" when, *as here,* such vessel does not customarily operate from ports within, to ports beyond, the boundaries of such state; the tax is levied upon the "employing" but the resultant state or condition of "employment" remains completely under the dominion of admiralty and maritime jurisdiction. Nor can the fact that Congress, in enacting the Social Security Act, 42 U.S.C.A. § 301 et seq. excepted from the term "employment" the service performed by persons as officers and members of a crew of a vessel on the navigable waters of the United States, *of itself,* operate as a prohibition against the State's levy of such an excise tax upon the act of employing such officers and members of crew, inasmuch as the two lawmaking bodies are independent of each other and the State never surrendered to the Federal Government its undoubted right of levying excise taxes.

■ Nor can such a prohibition be deduced from the further fact that the enactment of the two statutes envisaged a cooperative endeavor of Nation and State to meet the grave emergency problem of unemployment,—from the fact that the state law was intended to be integrated with the federal statute in order that the two sovereigns might work together to a common end (to use language from Buckstaff Bath House Co. v. McKinley, 308 U.S. 358, 60 S.Ct. 279, 84 L.Ed. 322); nor can it be reasonably contended that the state legislator was held to a punctilious setting of foot nowhere but in the tracks of Congress in going forward towards the attainment of the jointly-desired result. Surely no fault can be found with the legislator's doing more than Congress, if the purpose of the doing was directed to the same common end.

If it could be held that the taxing of the act of employing (as relates to plaintiff's employees who are engaged in their service as officers and members of crew under the circumstances attending plaintiffs' dredging operations in Louisiana) is prohibited, the prohibition would have to be based upon other ground than the exception of their employment from the

meaning of the term "employment", as such term is used in *that* statute.

There must be noted, however, the plaintiffs' further contention to the effect that, inasmuch as their vessels are all enrolled and licensed as vessels of the United States "entitled to the privileges of vessels employed in the coasting trade", the exaction of an excise tax by the State upon the employment of needed officers and members of crew for the navigation of such vessels under authority of said United States license, operates to restrict the free exercise of the license rights derived from the Constitution and laws of the United States; in support of which contention, plaintiffs cite Moran v. City of New Orleans, 1884, 112 U.S. 69, 5 S.Ct. 38, 28 L. Ed. 653; Harmon v. City of Chicago, 1893, 147 U.S. 396, 13 S.Ct. 306, 37 L.Ed. 216, and like cases; but a reading of the same makes it quite clear that, in each instance, the local authority in interest had sought to superimpose an additional license requirement which was to be complied with (under severe penalty), as condition precedent to navigating United States waters in commerce; or, in other words, the privileges conferred by the United States license at issue were not to be enjoyed, except subject to prior compliance with additional conditions laid down by the local taxing authority—a plain prescribing of regulations repugnant to and inconsistent with those of Congress; and, very properly, held invalid.

▆ The excise tax on employment levied by the Louisiana Unemployment Compensation Act, insofar as it relates to the employment by plaintiffs of officers and members of crew engaged in carrying on plaintiffs' dredging work within the State by means of enrolled and licensed vessels, which do not customarily operate "between ports in this State and ports outside this State", does not have the effect, even indirectly, of superimposing additional license requirements, upon the compliance wherewith is conditioned the enjoyment of the United States license right to navigate in the coasting trade, without let or hindrance.

As the Supreme Court, speaking through Chief Justice Hughes, observed in the case of Just et al. v. Chambers (The Friendship II), 1941, 312 U.S. 383, 668, 61 S.Ct. 687, 692, 85 L.Ed. 903, which was before it on certiorari to the United States Circuit Court of Appeals for the Fifth Circuit,

" * * * a State, in the exercise of its police power, may establish rules applicable on land and water within its limits, even though these rules incidentally affect maritime affairs, provided that the state action 'does not contravene any acts of Congress, nor work any prejudice to the characteristic features of the maritime law, nor interfere with its proper harmony and uniformity in its international and interstate relations.' "

In view of the premises, the Court's findings of fact and conclusions of law are as follows, viz:

### Findings of Fact.

The plaintiffs have failed to establish that the Louisiana Unemployment Compensation Law, i. e., Act No. 97 of 1936 (as amended by Act No. 164 of 1938, Act No. 16 of the First Extra Session of 1940 and Acts Nos. 10 and 11 of 1940) does contravene any act of Congress, or does work prejudice to the characteristic features of the maritime law, or does interfere with its proper harmony and uniformity in its international and interstate relations.

### Conclusions of Law.

1. The State of Louisiana, in the exercise of its police power, enjoyed the clear right to establish rules applicable to the act of employing on land and water within its limits (as are to be found embodied in said mentioned Unemployment Compensation Law, supra), even though such rules incidentally affect maritime affairs, provided that there was no such contravention of act of Congress, or the working of prejudice to the characteristic features of the maritime law, or interference with its proper harmony and uniformity in its international and interstate relations.

2. Plaintiffs' prayer that this Court decree unconstitutional, null and void said state statute, and particularly, Section 18 (g) (6) (C) thereof, insofar as it is sought to include within the term "employment" used therein the "services performed by the officers and members of the crews of complainants' vessels while operating on the navigable waters of the United States within the State of Louisiana," is devoid of sound legal basis and must be denied; and plaintiffs' action, therefore, should be dismissed at their cost.

Let judgment be so entered.